[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *State v. Jackson,* Slip Opinion No. 2014-Ohio-3707.]

<u>NOTICE</u>

This slip opinion is subject to formal revision before it is published in an advance sheet of the Ohio Official Reports. Readers are requested to promptly notify the Reporter of Decisions, Supreme Court of Ohio, 65 South Front Street, Columbus, Ohio 43215, of any typographical or other formal errors in the opinion, in order that corrections may be made before the opinion is published.

SLIP OPINION NO. 2014-OHIO-3707

THE STATE OF OHIO, APPELLEE, *v*. JACKSON, APPELLANT.

**[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *State v. Jackson,* Slip Opinion No. 2014-Ohio-3707.]**

*Criminal law—Judicial bias—Trial court's conducting of a hearing when defense counsel did not raise claim of intellectual disability—Waiver of jury trial—Jurisdiction and venue when crimes are committed in several counties—Death penalty upheld.*

(No. 2010-0944—Submitted February 4, 2014—Decided September 2, 2014.)

APPEAL from the Court of Common Pleas of Cuyahoga County,

No. CR-09-532145-A

_____

**O'DONNELL, J.**

{¶ 1} Jeremiah Jackson appeals as of right from his aggravated murder convictions for killing Tracy Pickryl and from his other felony convictions. A three-judge panel imposed the sentence of death for Pickryl's murder.

{¶ 2} We affirm Jackson's convictions and sentence of death.

# I. Trial Evidence

{¶ 3} Evidence introduced at trial showed that Jackson shot Pickryl while robbing the Soap Opera Laundry in Cleveland. Her murder ended a crime spree that began with Jackson's attempted murder of Stanley Bentley and included a series of six robberies in Cleveland, Sandusky, and Lorain between June 2 and June 18, 2009.

*A. Attempted murder of Stanley Bentley*

{¶ 4} Jackson and Bentley became friends while working together at the same company in 2006 and 2007. On the evening of June 1, 2009, Jackson visited Bentley outside Bentley's Cleveland residence. Jackson carried a bag with a gun inside, and he showed the gun to Bentley. The bag was left inside Bentley's home. Jackson departed later that evening, but before he left, Bentley told him not to forget his bag.

{¶ 5} Between 4:30 and 5:00 a.m. on June 2, Jackson and Maurice Harrison went to Bentley's home, and Jackson told Bentley that he had come to pick up his bag. Bentley told Jackson, "I thought you got the bag when you left. * * * I don't have the bag." According to Bentley, he got scared because Jackson became angry. Bentley then called his mother, Alfreda Rice, and told her what was going on. Jackson and Rice knew each other, and Jackson took the phone and talked to her. Jackson told Rice that he needed $500. Rice responded that she did not have any money and hung up.

{¶ 6} Bentley and Jackson continued to argue about the bag. Bentley saw Jackson put on a pair of work gloves and reach into his pocket. Bentley told Jackson that he had to go to work. Jackson replied, "You're not going to make it." Bentley then felt a "jolt" to the left side of his body. He jumped out a window and ran to a neighbor's house. The police were notified, and Bentley was taken to the hospital. He had been shot in the abdomen and remained in the hospital for more than two weeks.

*B. Robberies in Cleveland, Sandusky, and Lorain*

### 1. Super Wash Laundry robbery

{¶ 7} Around 11:30 p.m. on June 15, 2009, Jackson and Harrison walked into the Super Wash Laundry in Cleveland. They entered the office where Charles Caldwell, the laundry attendant, was seated and told him to put his head down and his hands up. Caldwell testified that one man carried a gun and the other man carried a bag. Jackson and Harrison then took approximately $200 from the cash drawer and some money from Caldwell's pockets and fled the scene. Surveillance cameras videotaped the robbery, and that tape was shown at trial.

{¶ 8} At trial, Katrina Dickerson testified, as part of a plea bargain, that she had driven the getaway car. Dickerson stated that on the evening of June 15, 2009, she had driven Jackson and Harrison to the Super Wash Laundry and that they had gotten out and robbed it. She also testified about her involvement as the driver during four other robberies and the robbery and murder at the Soap Opera Laundry.

### 2. Hobo Joe's Bar robbery

{¶ 9} Around 11:50 p.m. on June 15, 2009, Jackson, Harrison, James Dixon, and Dickerson entered Hobo Joe's Bar in Cleveland. One of the men hit Steven McKenty, a customer, in the head with a pistol and took his wallet, $117 in cash, and his cell phone. Another robber put a pistol to the head of James Sedivy, the bartender, and threatened to shoot him if he did not cooperate. That robber rifled through Sedivy's pockets and took money from the cash register. The robbers then left the bar.

### 3. Brickhouse Bar robbery

{¶ 10} Around 1:45 a.m. on June 17, 2009, Jackson and Dixon entered the Brickhouse Bar in Cleveland. Jackson and Dixon sat down at the bar and ordered a Corona and a tequila.

**{¶ 11}** About 15 minutes later, a third man entered the bar and directed Dwayne Buchannan and Monique Irby, two customers, to get on the floor and empty their pockets. Jackson then jumped over the bar, put a gun to the face of Jennifer Testa, the bartender, and took about $200 from the cash register. The three robbers then fled.

**{¶ 12}** At trial, Christopher Smith, a forensic scientist with the Ohio Bureau of Criminal Investigation, testified that he had examined the DNA on swabs that had been used to collect matter from the rim of a glass and a Corona beer bottle left on the bar. He testified that the DNA found on the glass was a mixture consistent with contributions from Dixon and Jackson. He also explained that Jackson could not be excluded as the source of the DNA found on the beer bottle. Smith determined that "the expected frequency of occurrence of the DNA profile from the swabs from the beer bottle * * * is 1 in 160,800,000,000,000,000 unrelated individuals."

### 4. Howard Johnson's Inn robbery

**{¶ 13}** Around 5:00 a.m. on June 17, 2009, Jackson, Harrison, and Dixon entered the lobby of Howard Johnson's Inn in Sandusky, Ohio, in Erie County. Jackson showed his gun to Katherine Schaffer, the desk clerk, and she gave them approximately $250. The robbers also stole a surveillance monitor from the office, and Jackson took Schaffer to a storage area and bound her with duct tape. The robbers then fled. At trial, Schaffer viewed surveillance-camera pictures taken during the robbery, and she identified Jackson as one of the perpetrators.

### 5. Walgreens robbery

**{¶ 14}** Around 5:45 a.m. on June 17, 2009, Jackson, Harrison, and Dixon entered a Walgreens drug store in Lorain. Kayla Gaughan, the cashier, was at the front register helping Robert Morrison, a customer, check out. Jackson approached Morrison, placed him in a headlock, and pointed a gun at his head. One of the other men then took money from the cash register. Jackson took

Morrison's cell phone, wallet, and about $20 and pushed him into a closet. Meanwhile, the third man went into the pharmacy area and robbed Mallory Fay, the pharmacist. The robbers then left the store. Again, surveillance video captured Jackson's participation in the robbery.

{¶ 15} Dickerson testified that after the Walgreens robbery on June 17, 2009, they drove to Cleveland. She took Jackson, Harrison, and Dixon to different locations in the Cleveland area.

{¶ 16} During the trial, Detective Michael Kitchen testified that the police were able to obtain cell-phone records that indicated where Jackson's, Dickerson's, and McKenty's cell phones were between June 15 and 18, 2009. These records showed that between 4:40 a.m. and 5:05 a.m. on June 17, following the robbery of the Brickhouse Bar in Cleveland, Jackson and his accomplices drove to Sandusky, where the robbery of Howard Johnson's occurred. Jackson's movements were then traced to the Lorain area, where the robbery of Walgreens took place. Cell-phone records showed that around 6:30 a.m., Jackson and his accomplices returned to the Cleveland area.

*C. Aggravated murder of Tracy Pickryl*
*and attempted murder of Christy Diaz*

{¶ 17} On the evening of June 17, 2009, Jackson contacted his friend Janica Jackson. At the trial, she testified that Jackson had asked her to borrow her car. He had offered her $100 and told her that he would return the car by 6:00 a.m. the next morning.

{¶ 18} Around 11:00 p.m. on June 17, Jackson and Dickerson got the car from Janica and Harrison joined them. Dickerson testified that she then drove to East 40th Street to pick up Dixon. Harrison exited the vehicle to find Dixon. Jackson and Dickerson then saw Harrison being arrested by members of the Special Weapons and Tactics ("SWAT") team on his way back to the car, so Jackson and Dickerson drove away.

{¶ 19} Jackson then told Dickerson to drive to a location near the Soap Opera Laundry. She testified that he exited the car and walked down the street.

{¶ 20} In the early morning hours of June 18, 2009, Tracy Pickryl and Christy Diaz were working at the Soap Opera Laundry. Around 4:30 a.m., Jackson walked into the laundry and approached them. According to Diaz, Jackson asked if he could have a discount because he had only a few items to wash. Pickryl replied that they could not give discounts. Jackson then pulled a gun and pointed it towards Pickryl's waist. He then demanded, "[C]ome on, give me the money." Jackson also pulled at a necklace Pickryl was wearing, but he was unable to break the chain.

{¶ 21} He directed Pickryl and Diaz toward the front counter. Jackson then pointed his gun at Pickryl's face and demanded, "[G]ive me the money." Diaz gave Jackson $6 from her pocket. But Pickryl told Jackson, "[W]e don't have no money here." Jackson repeated, "[G]ive me the money." Pickryl replied, "[D]ude, we don't have no money." Jackson grabbed Pickryl's necklace again and the chain broke when she pulled away. Jackson then grabbed Pickryl's bracelet, and she pulled back. According to Diaz, Pickryl turned her head toward Jackson and looked at him, and she looked down. Jackson then shot her in the face.

{¶ 22} Diaz testified that Jackson turned the gun on her and said, "[G]ive me the money." Diaz reached behind the microwave and handed him a pouch with money inside. Jackson pulled her toward a nearby office and tried to open it, but the door was locked. He then pointed the gun at her face and fired a shot. Diaz collapsed and thought she had been hit, because her ears were ringing and her face went numb. Jackson then ran out of the laundry.

{¶ 23} A surveillance video presented at trial showed Jackson coming into the laundry and taking Pickryl and Diaz at gunpoint to the front counter. Because

of the placement of the cameras, the video did not show Jackson shooting Pickryl or firing at Diaz.

{¶ 24} Dickerson testified that she had heard two gunshots after Jackson left the car and that shortly thereafter, Jackson ran back to the car and told Dickerson to open the trunk. He got into the trunk and told Dickerson to drive away. They later returned the car to Janica's house. Dickerson then picked up her car and dropped Jackson off near East 128th Street.

*D. Investigation and arrest*

{¶ 25} Pickryl was dead when emergency-medical-services personnel arrived. Diaz was clutching her head and told police officers that she had been shot, but an examination showed that she actually had not been shot.

{¶ 26} Investigators then began collecting evidence. A bullet casing and a piece of jewelry were found on the floor near the counter, and a spent bullet and bullet jacket were retrieved from the wall. In addition, a small strand of jewelry was found in the parking lot outside the laundry.

{¶ 27} At trial, Janica testified that she examined the inside of her car after Jackson returned it on the morning of June 18 and found a gold necklace in the cup holder between the seats. Around 8:30 a.m., Jackson called Janica and asked for a ride. He said he was in trouble and needed to hide in the trunk of her car. She declined but said she would talk to Jackson later.

{¶ 28} Following that phone call, Janica saw a video of the Walgreens robbery on a news website and recognized Jackson as the robber holding a gun to a victim's head. She also read about the shooting at the Soap Opera Laundry. She then called the police and turned over the necklace to them.

{¶ 29} Around 1:00 p.m. on June 18, Janica and Jackson spoke on the phone, and she asked whether he shot the lady at the Soap Opera Laundry. He admitted shooting her and said he did it because she would not give him the

money.  Janica also testified that Jackson had previously told her that he was on the run because he had "shot a guy, and the guy was in the hospital."

{¶ 30} On the morning of June 19, 2009, Detective Raymond Diaz obtained an arrest warrant for Jackson, and the police commenced a search for him.  Officers later received information that Jackson was at a house in Cleveland Heights.  On the evening of June 20, 2009, members of the SWAT team surrounded the house, and Jackson surrendered.

*E. Jackson's statements to police*

{¶ 31} Detective Andrew Ezzo testified that Jackson was advised of his *Miranda* rights after he was arrested and that Jackson waived those rights. Jackson then told Ezzo that his gun was in an upstairs closet of the home in which he had been found.  After obtaining consent from the home's resident, the police seized a Taurus Model .380-caliber handgun with a loaded magazine.

{¶ 32} Jackson was placed in a police cruiser after being arrested.  Officer Michael Ryan testified that while asking Jackson routine questions for booking purposes, Jackson said, "[T]ake me to the chair.  My life is over.  * * *  I didn't mean to kill the bitch.  * * *  I just wanted to pop a round off to scare her."  He also said that he would "never give up his boys" and that he had "made his boy a little bit of money, and his money was buried for his daughter."

{¶ 33} On the morning of June 22, 2009, Detective Diaz conducted a videotaped interview of Jackson.  After waiving his *Miranda* rights, Jackson admitted shooting Pickryl.  But Jackson said that he had been trying to scare her and had not intended to kill her.

{¶ 34} During the interview, Jackson described the Soap Opera Laundry robbery.  He said that he borrowed a car from a friend and drove past the laundry a couple of times to make sure it was open.  He parked the car two or three blocks from the laundry and walked there.  Jackson said he approached the two women

8

inside it and said, "I'm going to stick ya'll up. Give me the money. Just be cool. Just give me the money ya'll. That['s] all I want."

{¶ 35} He then explained how he shot Pickryl:

Yeah, she started playing with this little change, knowing that I wanted some real money. * * * And I'm like just give me the money. * * * Everything will be alright. * * * She wouldn't give me the money. That's when I tried to grab her necklace off her arm. She yanked back, and I'm like fuck it, man I'm gonna pop one, and let her know I'm not playin'. I popped one and *she fell into it*. That's when I killed her. And then the other girl, she showed me where the money was, she gave me a pouch. I thought it was pretty much a lot of money in there, but it wasn't shit. * * *

Then like the other girl was crying. So I just shot one. I went around her head to make sure I didn't hit her. Popped the gun, you know what I'm saying. Just so she know * * * just like chill the fuck out. And don't run out of here.

(Emphasis added.) Jackson said that he left the laundry and then returned the car to his friend's house, leaving the necklace in the car.

{¶ 36} As to the other offenses, Jackson admitted shooting Bentley and participating in the robberies in Sandusky and Lorain, but he claimed that Harrison had not been involved. Jackson also denied participating in the robberies of the Brickhouse Bar and Hobo Joe's Bar.

*F. The autopsy and other forensic evidence*

{¶ 37} Dr. Elizabeth Balraj, a deputy coroner for Cuyahoga County, performed the autopsy on Pickryl and testified that Pickryl had a gunshot wound

above her right eye. Dr. Balraj stated that an internal examination showed that the bullet entered the right side of the brain and traveled toward the back and left side of the brain.

{¶ 38} Dr. Balraj testified that she found stippling on the skin around the entrance wound. The pattern of stippling was compared with different patterns of stippling during test firings of the suspected murder weapon, which showed that the stippling found on Pickryl was consistent with the "type of pattern of stippling [that] appeared at the range of seven to nine inches from the muzzle of the gun to the target." Dr. Balraj determined the cause of death to be the gunshot wound in the head with perforations of the skull and brain.

{¶ 39} James Kooser, a firearms examiner with the Cleveland police, examined the .380-caliber handgun found at the time of Jackson's arrest. Kooser testified that he had examined the bullet recovered during the autopsy, but it was too damaged to make any comparisons to bullets fired from the suspected murder weapon. He had also examined a cartridge case and a spent bullet with a copper jacket found at the Soap Opera Laundry. Kooser testified, "This weapon, in my opinion, fired that 380 auto cartridge case and the spent bullet."

*G. Defense case*

{¶ 40} Jackson testified in his own behalf and admitted shooting and killing Pickryl. He then discussed his family life, educational background, and employment history. Jackson also stated that he had been convicted of drug possession in 2004 and spent a year in prison after violating probation.

{¶ 41} During the summer of 2009, Jackson testified, he was using PCP, marijuana, and ecstasy, and he was drinking heavily. Jackson stated that he was on drugs during all the incidents, including the Soap Opera Laundry, and that he had not slept from June 15 to June 18, because of his constant drug use.

{¶ 42} Jackson said he "messed up real bad" in killing Pickryl, and he apologized to her family. He said, "I just killed an innocent person that ain't did

nothing to me[.] * * * And she was good, a good lady, from what I see." Jackson added, "Whether the Court like it or not, I don't really feel fucked up about killing nobody. It's who I killed that pisses me off for real; do you know what I'm saying?"

{¶ 43} Jackson also testified, "I had no intentions to kill anybody when I came in there to rob the Soap Opera Laundry." Jackson stated, "I was trying to intimidate her to hurry up," and "I was trying to pop past the back of her head." He claimed that Pickryl turned her head and "budged up" at the same time he fired the gun, causing her to be shot and killed.

{¶ 44} After shooting Pickryl, Jackson admitted, he thought about shooting Diaz, because he did not want to leave any witnesses. But Jackson said, "I couldn't do it," and so he had shot over her head. He testified that Diaz was screaming and that he fired to "shut her up" so he could get out of there, but he "wasn't trying to kill nobody."

{¶ 45} Jackson also described what led to his shooting Bentley. Jackson and Bentley had known each other for about five years. Jackson testified that he went to Bentley's residence on the day before the shooting and they drank a couple of beers.

{¶ 46} Bentley asked Jackson what was in the bag that he had with him, and Jackson opened the bag and showed him it contained a gun and some jewelry. Bentley then asked Jackson if he could keep the bag for Jackson. Jackson replied that he was giving the bag to someone else and that it was not his. But Jackson let Bentley take the bag. As Jackson later got ready to leave, he asked Bentley for the bag. However, Bentley said, "Red took my keys and * * * I can't get in the house." Bentley asked Jackson to return in an hour. But when he returned an hour later, Bentley was gone.

{¶ 47} Around 4:30 or 5:00 a.m. the next morning, Jackson testified, he returned to Bentley's residence and banged on the door. Jackson stated that he

could smell crack-cocaine smoke coming from inside the house and that a prostitute walked out the door as he arrived. Jackson entered the house and told Bentley that he needed his bag, but the bag was gone, and Jackson concluded that Bentley had sold it and used the money to buy crack cocaine. According to Jackson, "[Bentley] got to reaching for something, and I know that gun is in there, and that is a big gun. * * * I'm not about to get shot * * * so basically I hit him in the leg—tried to hit him somewhere so—because he was reaching[.]"

## II. Case History

{¶ 48} Jackson was charged with three counts of aggravated murder for killing Pickryl. Count 31 charged Jackson with aggravated murder during an aggravated robbery, R.C. 2903.01(B). Count 32 charged him with aggravated murder during a kidnapping, R.C. 2903.01(B), and Count 33 charged him with aggravated murder by purposely killing Pickryl with prior calculation and design, R.C. 2903.01(A).

{¶ 49} Each of the aggravated-murder counts included three death-penalty specifications: course of conduct involving the purposeful killing or attempt to kill two or more persons (Pickryl, Diaz, and Bentley), R.C. 2929.04(A)(5), felony murder predicated on aggravated robbery, R.C. 2929.04(A)(7), and felony murder predicated on kidnapping, R.C. 2929.04(A)(7).

{¶ 50} As to other counts involving Pickryl, Count 36 charged Jackson with kidnapping, and Counts 34 and 35 charged the aggravated robbery of the Soap Opera Laundry and/or Pickryl. As to Diaz, Count 37 charged him with attempted murder, Counts 38 and 39 charged aggravated robbery, Count 40 charged felonious assault, and Count 41 charged kidnapping. As to Bentley, Count 1 charged Jackson with attempted murder, Counts 2 and 3 charged aggravated robbery, and Counts 4 and 5 charged felonious assault. Counts 6 and 42 were dismissed.

{¶ 51} As to the other robberies, Counts 7 though 30 charged Jackson with various offenses of aggravated robbery, robbery, kidnapping, and felonious assault. All the capital and noncapital counts included firearm specifications.

{¶ 52} Jackson pleaded not guilty to all charges and specifications.

{¶ 53} Following the completion of the state's case, defense counsel made a Crim.R. 29 motion for acquittal. The three-judge panel denied the motion, but it deleted some language from various counts and specifications to conform the counts to the evidence.

{¶ 54} The three-judge panel found Jackson guilty of the three aggravated-murder counts and the accompanying death-penalty specifications. However, the panel found that Jackson was guilty of the course-of-conduct specification only as to Pickryl and Diaz. The panel also found Jackson guilty of all the noncapital counts and all the accompanying gun specifications and sentenced him accordingly.

{¶ 55} Following a mitigation hearing, the panel sentenced Jackson to death.

### III. Issues on Appeal

{¶ 56} In this appeal, Jackson raises 14 propositions of law.

{¶ 57} The principal issues for review include the trial court's decision to conduct a limited hearing regarding an issue under *Atkins v. Virginia*, 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002), the validity of the jury waiver, because it occurred soon after Jackson informed the court that he had a bad headache and was having trouble focusing, the jurisdiction of the Cuyahoga County Grand Jury over offenses occurring in different counties and the sufficiency of the indictment as to those offenses, and ineffective assistance of counsel during the penalty phase.

*A. Pretrial and trial issues*

1. Judicial bias by conducting an unrequested *Atkins* hearing

(proposition of law No. I)

**{¶ 58}** Jackson contends that the trial court erred by ordering an *Atkins* hearing even though the defense had not requested it.  He argues that the trial court's action showed judicial bias and interfered with defense counsel's conduct of the case.  Even assuming that the trial court did not overstep its bounds, he maintains, the *Atkins* hearing was flawed.[1]

*a*. Atkins *and* Lott

**{¶ 59}** On June 20, 2002, the Supreme Court ruled that the execution of a mentally retarded criminal violated the Eighth Amendment.  *Atkins v. Virginia*, 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002).  *Atkins* left to the states "'the task of developing appropriate ways to enforce the constitutional restriction'" on executing the mentally retarded.  *Id*. at 317, quoting *Ford v. Wainwright*, 477 U.S. 399, 405, 416-417, 106 S.Ct. 2595, 91 L.Ed.2d 335 (1986).

**{¶ 60}** In *State v. Lott*, 97 Ohio St.3d 303, 2002-Ohio-6625, 779 N.E.2d 1011, we developed procedures and substantive standards for resolving *Atkins* claims.  *Lott* adopted a three-part test that had been cited with approval in *Atkins* at 308, fn. 3. The "*Atkins*" test" defined mental retardation as (1) significantly subaverage intellectual functioning, (2) significant limitations in two or more adaptive skills, such as communication, self-care, and self-direction, and (3) onset before the age of 18.  *Id*. at ¶ 12.  *Lott* went on to state:

Most state statutes prohibiting the execution of the mentally retarded require evidence that the individual has an IQ of 70 or

---

[1] The hearing is referred to as an "*Atkins* hearing," but the trial court did not conduct a full *Atkins* hearing in evaluating whether defense counsel was justified in not raising a claim that Jackson was mentally retarded, nor did it make any ruling in that regard.  It merely had the experts testify.

below. * * * While IQ tests are one of many factors that need to be considered, they alone are not sufficient to make a final determination on this issue. * * * We hold that there is a rebuttable presumption that a defendant is not mentally retarded if his or her IQ is above 70.

*Id.*

{¶ 61} *Lott* also held that the appropriate time to present an *Atkins* claim is at trial. *Lott* stated that "the trial court should consider defense *Atkins* claims, and hold hearings, in accordance with the standards set out in this opinion." *Id.* at ¶ 25.

### b. Facts

#### (1) Trial court orders a hearing

{¶ 62} Before trial, the court expressed concern about defense counsel's strategy and trial preparation. On January 21, 2010, the trial court filed the following journal entry:

The court has scheduled a hearing on whether the defendant's attorneys have truly prepared this case for trial or (A) have only planned to plead the defendant guilty to one or more charges and/or (B) have planned to under-represent the defendant and provide him with an ineffective assistance of counsel basis for later appeal. The hearing on this issue is set for 01/25/10 * * *.

{¶ 63} On January 25, 2010, defense counsel provided the court with information about its trial preparation. Defense counsel stated that Dr. John Fabian, a forensic and clinical psychologist, was meeting with Jackson and

working on a report. Defense counsel informed the court that Dr. Fabian's report would be completed and his opinion disclosed within two weeks.

{¶ 64} On March 4, 2010, defense counsel reported that Dr. Fabian had completed his report. Dr. Fabian analyzed Jackson's IQ and reported that he had a full-scale IQ of 75.

{¶ 65} On March 19, 2010, the trial court filed a journal entry ordering "defense counsel to file any request for an *Atkins* hearing setting forth the factual foundation for such a hearing." In the same entry, the court advised, "If no such filing is made, then the court will conduct a record hearing to establish why defense counsel refrained from requesting an *Atkins* hearing."

{¶ 66} During subsequent proceedings, defense counsel informed the court that they had consulted with Dr. Fabian and would not be filing a request for an *Atkins* hearing. The trial court responded:

> Well, it came to the Court at the last hearing, last pretrial, that I did want to have a hearing to build a record to establish that the Atkins issue was considered, diligently investigated, and a justifiable decision made to pursue it or not.
>
> That was because the IQ information were the numbers that they were.
>
> While the Court is not surprised with your decision that you won't pursue the Atkins issue, I think there is a couple of ways to go at this.
>
> First of all, we could take both Doctor Aronoff's addressing of the mental retardation issue in his sanity or competency reports and seal that up with Doctor Fabian's report on that issue.
>
> So that would be one way, building a record under seal to justify the defense's determination on the Atkins hearing.

I'm not sure we need to go beyond that.

Because the numbers are what they are, I think we would be better served to do a brief hearing.

**{¶ 67}** Defense counsel then stated, "After going through the report and consulting with our expert, * * * Dr. Fabian, we're most comfortable saying that we choose not to pursue that issue at this time and, therefore, that is why we did not file an Atkins brief." Defense counsel stated that Dr. Fabian might be called as a mitigation witness. He also added, "I'm uncomfortable with putting [Dr. Fabian] on the stand or to testify, whether it be by phone or in person, to give the government access to him, the record access to his testimony, before we actually call him as our witness."

**{¶ 68}** The trial court responded that the state would not be permitted to talk about anything other than the mental-retardation issue. The trial court also said, "When you say we're not raising the issue at this time, let me remind you this is the only time you can raise it." The trial court added:

The fact that it's a do or die, do it now or don't do it at all, is why I was the person that came up with wanting to have a record hearing to * * * build a record on why it wasn't being done.

Otherwise with the numbers that are being bandied about by Dr. Fabian and Dr. Aronoff, * * * someone could second guess, well, we have, * * * with the Flynn affect [sic] this and that, something could have been done with it.[2]

---

[2] The "Flynn effect" posits that IQ scores for a population rise over time and that IQ tests that are not "re-normed" to adjust for rising IQ levels will overstate a testee's IQ. *See Walker v. True*, 399 F.3d 315, 322 (4th Cir.2005).

{¶ 69} Defense counsel reiterated, "After consultation with Dr. Fabian, both my co-counsel and I, based on his advice as to whether or not we would succeed or fail on that issue, we chose not to go there, not to pursue it." The trial court replied, "But, see, how do I know he considered the Flynn affect [sic]?" The trial court also mentioned that Dr. Aronoff did only four subtests of the Wechsler IQ test and that the court did not know how many subtests Dr. Fabian had completed in testing Jackson's IQ.

(2) Hearing conducted

{¶ 70} On March 22, 2010, the trial court held a limited hearing on the *Atkins* issue. Dr. Michael Aronoff, a psychologist with the Cuyahoga County Court Psychiatric Clinic, testified that he had conducted a competency and sanity evaluation of Jackson. Dr. Aronoff evaluated Jackson by using the Vocabulary and Matrix Reasoning subtests of the Wechsler Abbreviated Scale of Intelligence ("WASI"). He testified that Jackson obtained a full-scale IQ score of 87 and that "with 95 percent certainty * * * the defendant's true full scale IQ score lies within the range of 82 to 93."

{¶ 71} Dr. Aronoff also testified that Jackson's IQ had been evaluated with the General Ability Measure for Adults ("GAMA") in 2003 and 2007. Jackson's GAMA IQ score was 87 in 2003 and 93 in 2007. Dr. Aronoff stated that the GAMA focuses primarily on performance-related tasks. He said, "It's a group administered intelligence test that is often used in a setting such as prison because it affords one the opportunity to get a gross estimate of someone's intellect without having to give an IQ test one on one."

{¶ 72} Dr. Aronoff reviewed the results of the Wechsler Adult Intelligence Scale, Fourth Edition ("WAIS-IV"), that Dr. Fabian administered to Jackson. Jackson's IQ score was 75 on the WAIS-IV. Dr. Aronoff stated that the standard error of measurement ("SEM") for the WAIS-IV IQ test administered to a person of Jackson's age (30 years old) is 2.12. He concluded that "the examiner can say

18

with 95 percent confidence that based on [the] full scale IQ score of 75 on the WAIS IV taking into consideration [the] standard error of measurement and other day to day factors, that an individual's IQ score lies within the range of 71 to 80."

{¶ 73} Dr. Aronoff also testified that none of the records he was provided with suggested that Jackson met the second part of the *Atkins* test—onset of mental retardation before the age of 18. He said, "[F]rom the records that I reviewed there was nothing to suggest that he has been tested or that he was mentally retarded."

{¶ 74} During a telephone interview, Dr. Fabian explained that he was comfortable with the defense decision not to pursue an *Atkins* hearing. He stated that he had met with Jackson on seven occasions for a total of about ten hours, interviewed various family members, and reviewed Jackson's school records. Based on his review, Dr. Fabian stated that he did not believe that Jackson was mentally retarded. He added, "My ethics say if I believe this person is incompetent or mentally retarded, I would indicate that to them." But, Dr. Fabian said, "It's my opinion that it's not there."

{¶ 75} Dr. Fabian confirmed that Jackson's IQ score was 75 on the WAIS-IV and that his score was not inconsistent with Jackson's IQ score on the test administered by Dr. Aronoff. Dr. Fabian stated, "I gave him a full IQ test. His overall percentage range was five percentile, so he's scoring lower with me. But I wouldn't say that is inconsistent because [Dr. Aronoff] only gave like two of the ten subtests that I would give."

{¶ 76} The trial court concluded the hearing following Dr. Fabian's testimony but made no findings as to whether Jackson was mentally retarded under *Atkins*.

*c. Analysis*

(1) Judicial bias

**{¶ 77}** Jackson argues that the trial court exhibited bias in conducting an *Atkins* hearing that defense counsel did not request.

**{¶ 78}** "It is well settled that a criminal trial before a biased judge is fundamentally unfair and denies a defendant due process of law." *State v. LaMar*, 95 Ohio St.3d 181, 2002-Ohio-2128, 767 N.E.2d 166, ¶ 34, citing *Rose v. Clark*, 478 U.S. 570, 577, 106 S.Ct. 3101, 92 L.Ed.2d 460 (1986). "Judicial bias has been described as 'a hostile feeling or spirit of ill will or undue friendship or favoritism toward one of the litigants or his attorney, with the formation of a fixed anticipatory judgment on the part of the judge, as contradistinguished from an open state of mind which will be governed by the law and the facts.' " *State v. Dean*, 127 Ohio St.3d 140, 2010-Ohio-5070, 937 N.E.2d 97, ¶ 48, quoting *State ex rel. Pratt v. Weygandt*, 164 Ohio St. 463, 132 N.E.2d 191 (1956), paragraph four of the syllabus.

**{¶ 79}** First, Jackson asserts that the trial court's order to conduct an *Atkins* hearing shows that the judge was upset with counsel's diligence in preparing his case and was harboring a bias against the defense. The trial court expressed concern about defense counsel's trial preparation and strategy during pretrial proceedings. But a hearing was conducted on this matter, and defense counsel provided the court with information that showed that the defense was diligently preparing for trial. Nothing shows that the trial court harbored bias against defense counsel as a result of early concerns that prompted the court to order a hearing.

**{¶ 80}** Jackson refers to the trial court's hearing as a "reverse-*Atkins* hearing," because it was conducted to show that he was not mentally retarded. However, this is a misnomer, and the record does not indicate that the hearing was held for this purpose. Instead, the trial court conducted the hearing to ensure that

Jackson received a fair trial and to ensure the appropriateness of proceeding to trial with a potential death sentence. The trial court emphasized the importance of holding the hearing, because an *Atkins* hearing must be conducted during the trial and not later. *See State v. Frazier*, 115 Ohio St.3d 139, 2007-Ohio-5048, 873 N.E.2d 1263, ¶ 155 (defendant waives an *Atkins* claim by not raising it at trial). It is also clear that the trial court conducted the hearing with an open mind and would have ordered a further evaluation of Jackson if the evidence indicated that he might be mentally retarded.

**{¶ 81}** Jackson cites *Dean* as supporting his claim. In *Dean*, the trial court made accusatory and threatening comments toward counsel during trial and denied counsel reasonable opportunities to consult with the defendant. 127 Ohio St.3d 140, 2010-Ohio-5070, 937 N.E.2d 97, at ¶ 51 and 53. Moreover, the trial court suggested that counsel had manipulated, defrauded, and deceived the court in attempting to disqualify the judge from sitting on the trial. *Id*. at ¶ 22 and 51. Indeed, the trial court found counsel in direct criminal contempt after the trial and fined them each $2,000. *Id*. at ¶ 46.

**{¶ 82}** Here, the trial court exhibited no ill will toward the defense by ordering the hearing. It listened to Dr. Aronoff's and Dr. Fabian's evaluation of Jackson's IQ scores and heard their opinion that Jackson did not meet the *Atkin*s criteria. Nothing in the record indicates that the trial court was biased against defense counsel.

**{¶ 83}** Second, Jackson argues that the trial judge's overzealous desire to build a record evinced a bias in favor of the state, which was seeking the death penalty.

**{¶ 84}** There is no evidence to support this claim. Defense counsel averred that Jackson was not mentally retarded and was thus eligible for the death penalty. The hearing elicited opinions and testimony that may have shown that

Jackson was mentally retarded and thus *not* eligible for the death penalty. Thus, there is no basis to conclude bias existed on the part of the judge.

{¶ 85} Finally, Jackson invokes *State v. Gillard*, 40 Ohio St.3d 226, 533 N.E.2d 272 (1988), *overruled in part on other grounds*, *State v. McGuire*, 80 Ohio St.3d 390, 402-403, 686 N.E.2d 1112 (1997), and argues that the trial court should have appointed another judge to conduct the *Atkins* hearing so that the sitting judge would not have been influenced by the adduced evidence. *Gillard* holds, "When the state seeks to obtain relief from discovery or to perpetuate testimony under Crim.R. 16(B)(1)(e) [now, Crim.R. 16(D)(1)], the judge who disposes of such a motion may not be the same judge who will conduct the trial." *Id*. at paragraph one of the syllabus. *Gillard* adopted this rule because "when a judge hears information [while conducting a pretrial hearing] that a defendant has attempted to harm, coerce, or intimidate an opposing witness, there is an unnecessary risk that the judge will harbor a bias against that defendant." *Id.* at 229.

{¶ 86} *Gillard*, however, is inapposite. Testimony about mental retardation is not similar to testimony that the defendant may have intimidated witnesses, nor did Jackson argue convincingly otherwise. Thus, the trial court did not need to appoint another judge to conduct an *Atkins* hearing.

(2) Interference with defense counsel

{¶ 87} Jackson argues that the trial court improperly interjected itself into the defense function after trial counsel informed the court that it was not going to raise an *Atkins* defense.

{¶ 88} Every trial court has a responsibility to conduct a trial in an orderly fashion and to ensure that a defendant receives a fair trial. *See State v. Fears*, 86 Ohio St.3d 329, 353, 715 N.E.2d 136 (1999) (Moyer, C.J., dissenting). However, "trial courts cannot interfere with counsel's trial tactics or representation of their clients." *State v. Hill*, 75 Ohio St.3d 195, 212, 661 N.E.2d 1068 (1996).

**{¶ 89}** First, Jackson argues that the trial court's interference with his counsel's strategy undermined his confidence in counsel. However, Jackson's generalized claim fails to explain how the trial court's action had any adverse impact on the attorney-client relationship. Thus, we reject this claim.

**{¶ 90}** Second, Jackson argues that the court's interference with the defense case resulted in a skewed assessment of his low intelligence, because a full evaluation was not conducted to determine whether he was mentally retarded. Jackson asserts that this resulted in an improper assessment of his low intelligence as a mitigating factor. However, nothing in the record indicates that Dr. Fabian's later mitigation testimony about Jackson's low intelligence was skewed as a result of his failure to conduct a full evaluation of Jackson for *Atkins* purposes. Accordingly, we also reject this claim.

**{¶ 91}** Finally, Jackson argues that the court's interference in defense counsel's strategy may have precluded him from raising an *Atkins* claim during future postconviction proceedings. Jackson asserts that if a full adaptive-functioning investigation had been completed, he may have been found to be mentally retarded. But he argues that such claims can now be dismissed on the basis of res judicata. We also reject this argument.

**{¶ 92}** Under the doctrine of res judicata, a defendant cannot raise an issue in a postconviction petition if he or she *raised or could have raised* the issue at the trial that resulted in that judgment of conviction or on an appeal from that judgment. *State v. Szefcyk*, 77 Ohio St.3d 93, 96, 671 N.E.2d 233 (1996); *State v. Perry*, 10 Ohio St.2d 175, 226 N.E.2d 104 (1967), paragraph nine of the syllabus.

**{¶ 93}** Here, the trial court conducted the hearing because Jackson would have waived his *Atkins* claim if he had not raised it at trial. *See Frazier*, 115 Ohio St.3d 139, 2007-Ohio-5048, 873 N.E.2d 1263, at ¶ 155 (an *Atkins* claim can be waived). Moreover, as the United States Supreme Court has stated, a " 'procedure does not run foul of the Fourteenth Amendment because another

method may seem to our thinking to be fairer or wiser or to give a surer promise of protection to the prisoner at the bar.' " *Leland v. Oregon*, 343 U.S. 790, 799, 72 S.Ct. 1002, 96 L.Ed. 1302 (1952), quoting *Snyder v. Massachusetts*, 291 U.S. 97, 105, 54 S.Ct. 330, 78 L.Ed.2d 674 (1934); *see also Medina v. California*, 505 U.S. 437, 451, 112 S.Ct. 2572, 120 L.Ed.2d 353 (1992) ("The Due Process Clause does not * * * require a State to adopt one procedure over another on the basis that it may produce results more favorable to the accused").

**{¶ 94}** Furthermore, Jackson's claim that he may have been found to be mentally retarded if a full adaptive-functioning test had been completed is speculative. This argument also overlooks the requirement that all three parts of the *Atkins* test be met before a defendant can be found to be mentally retarded. *Lott*, 97 Ohio St.3d 303, 2002-Ohio-6625, 779 N.E.2d 1011, at ¶ 12. Even if additional testing had shown lower adaptive functioning, Jackson has made no showing that he met the remaining parts of the *Atkins* test.

(3) Failure to conduct a complete *Atkins* hearing

**{¶ 95}** Jackson argues that even assuming that the trial court did not overstep its boundaries in ordering a hearing, the trial court failed to conduct a proper *Atkins* hearing. Jackson argues that the trial court failed to consider the second prong of the mental-retardation definition: "significant limitations in two or more adaptive skills, such as communication, self-care, and self-direction." *Id.* at ¶ 12. Jackson also argues that the trial court failed to consider the Flynn effect and the SEM in considering his IQ scores.

**{¶ 96}** In this instance, the trial court did not conduct an *Atkins* hearing. The trial court held a hearing "to build a record to establish that the *Atkins* issue was considered, diligently investigated, and a justifiable decision made to pursue it or not." The trial court focused on the intellectual-functioning part of the mental-retardation definition. Dr. Aronoff and Dr. Fabian addressed Jackson's IQ

scores and explained that they were above 70. Pursuant to *Lott*, his IQ scores raise a rebuttable presumption that he is not mentally retarded. *Lott* at ¶ 12.

{¶ 97} The trial court also considered the Flynn effect in evaluating Jackson's IQ scores. Dr. Aronoff discussed the Flynn effect and the theory that "generations get smarter over time," and he acknowledged that a test that was "standardized 25 years before, because of the Flynn effect, * * * might be inaccurate" and a "score of 80 might actually be lower."

{¶ 98} In addition, the trial court considered the SEM in evaluating Jackson's full-scale IQ score of 75. Dr. Aronoff testified that "[a]ccording to the WAIS IV manual the standard error of measurement for similarly aged persons as Mr. Jackson is 2.12." He stated that there is a 90 percent certainty that Jackson's full-scale IQ score lies within the range of 72 to 79 and that "[f]or the 95 percent confidence interval it would be 71 to 80."

{¶ 99} Finally, Jackson is not claiming that he is mentally retarded. Thus, Jackson's complaint that the trial court conducted an abbreviated *Atkins* hearing makes no difference to the outcome of the case. Jackson was not prejudiced by the hearing, because the court did not conduct an *Atkins* hearing nor did it reach a conclusion or journalize an entry to that effect, but rather it elicited expert testimony to demonstrate that the matter had been considered.

### d. Conclusion

{¶ 100} Based upon Jackson's IQ scores and the possible impact of the Flynn effect, the trial court was justified in inquiring into whether an evaluation of Jackson's mental abilities was appropriate. In that regard, the trial court did not demonstrate judicial bias or unduly interfere with defense counsel's function by eliciting that testimony.

{¶ 101} The trial court's decision to conduct an evidentiary hearing on the *Atkins* issue did not prejudice Jackson and could have been favorable to his defense. No evidence was presented showing that Jackson was mentally retarded.

Thus, even assuming that the trial court overstepped its bounds in conducting this abbreviated hearing, no prejudice occurred. Accordingly, we reject proposition of law No. I.

### 2. Jury waiver (proposition of law No. II)

{¶ 102} Jackson argues that his waiver of a jury trial was not voluntary, knowing, and intelligent, because he told the court that his head was "banging" and he was unable to focus during the trial court's waiver inquiry.

*a. Jury-waiver inquiry*

{¶ 103} During a pretrial hearing, Jackson submitted his written waiver of a jury trial to the trial court and informed the court that he had fully discussed his rights to a jury trial with defense counsel before signing the waiver. The trial court then reviewed the written waiver with him and explained the consequences of waiving a jury trial. The following exchange occurred:

THE COURT: And it says—it goes on to say you're not under the influence of any drugs, alcohol or medication that would affect your decision. Does the doctors (sic) have you on any drugs or medication of any kind?

THE DEFENDANT: I feel sick, but other than that.

THE COURT: When you say you feel sick, do you have a head cold or upset stomach? What?

THE DEFENDANT: My head is banging right now. I didn't get a chance to get in the shower, nothing. They just totally woke me up and said you're going to court. So I'm like just out of it. I didn't get a chance to pull myself together in court.

THE COURT: If you are in jail right now and your head was pounding, what could you do about it?

THE DEFENDANT: I would probably be taking Tylenol, probably get some water. I'm probably dehydrated.

THE COURT: You know it's about 3:20 in the afternoon. Did they give you lunch?

THE DEFENDANT: Yeah, I had a bologna sandwich and bread.

THE COURT: Did you have any liquid?

THE DEFENDANT: No.

* * *

THE COURT: Okay. Well, we're going to arrange for some paper cups. If we have water brought, will that help?

THE DEFENDANT: Yes.

THE COURT: Are you well enough for me to move on with this, or do you want to take a rest?

THE DEFENDANT: I'm alright.

THE COURT: If you change your mind, you will tell me, right?

THE DEFENDANT: Yes.

THE COURT: I'm not happy to hear that your head is pounding. I know what that is like. That is not good.

{¶ 104} The trial court then continued to explain the jury waiver. It discussed mitigation and explained that all 12 jurors would have to agree on a death sentence. The trial court also explained the life sentences that a jury might impose. As the questioning progressed, the trial court noted that Jackson was provided some water. Shortly thereafter, the following discussion ensued:

THE COURT: * * * If [the jury] cannot unanimously agree on a life sentence, then the matter of the sentence is out of their hands and given to the trial Judge to pick a life sentence. Have I confused you?

THE DEFENDANT: My head hurts. I can't really focus right now.

MR. MULLEN (Defense counsel): He said his head hurts. He's a little delusional. That is why we got the water. He ate, but I don't think he had any water.

THE DEFENDANT: I understand a little, little by little.

THE COURT: I'll give you an opportunity here in a minute to talk to your lawyers, too.

{¶ 105} The trial court explained that a three-judge panel would decide Jackson's case if he waived a jury trial. It also provided an explanation about how a three-judge panel would decide Jackson's case. The trial court then gave Jackson an opportunity to confer with counsel before concluding the inquiry. The trial court then finished the colloquy with Jackson about the waiver:

THE COURT: Any questions Mr. Jackson?

THE DEFENDANT: No, Ma'am.

THE COURT: You want more water?

THE DEFENDANT: No. I'm all right. Thank you.

THE COURT: What?

THE DEFENDANT: No thank you.

THE COURT: Okay. As I said earlier, Mr. Mullen did sign the certification that everything has been explained to you.

Any questions at all in your mind, Mr. Jackson, about the wisdom of waiving your jury trial?

THE DEFENDANT: No, Ma'am.

THE COURT: You're sure this is what you want to do?

THE DEFENDANT: Yes, Ma'am.

THE COURT: Okay. I'm going to find this was an intelligent, voluntary and knowingly made decision on Mr. Jackson's part to waive his jury trial.

### b. Jury-waiver requirements

{¶ 106} A jury waiver must be voluntary, knowing, and intelligent. Crim.R. 23; *State v. Fitzpatrick*, 102 Ohio St.3d 321, 2004-Ohio-3167, 810 N.E.2d 927, ¶ 37. If the record shows a jury waiver, the conviction will not be set aside except on a plain showing that the defendant's waiver was not freely and intelligently made. *Fitzpatrick* at ¶ 37. Moreover, a written waiver is presumptively voluntary, knowing, and intelligent. *See United States v. Sammons*, 918 F.2d 592, 597 (6th Cir.1990); *State v. Hunter*, 131 Ohio St.3d 67, 2011-Ohio-6524, 960 N.E.2d 955, ¶ 49.

{¶ 107} R.C. 2945.05 requires that a "waiver of trial by jury must be made in open court after the defendant has been arraigned and has had opportunity to consult with counsel." But "[t]here is no requirement for a trial court to interrogate a defendant in order to determine whether he or she is fully apprised of the right to a jury trial." *State v. Jells*, 53 Ohio St.3d 22, 559 N.E.2d 464 (1990), paragraph one of the syllabus. Indeed, "a defendant need not have a complete or technical understanding of the jury trial right in order to knowingly and intelligently waive it." *State v. Bays*, 87 Ohio St.3d 15, 20, 716 N.E.2d 1126 (1999). Rather, to comply with R.C. 2945.05, this court has held:

We do not mandate magic words, or a prolonged colloquy, but simply what Ohio law intends—that a defendant while in the courtroom and in the presence of counsel, if any, acknowledge to the trial court that the defendant wishes to waive the right to a jury trial.

*State v. Lomax*, 114 Ohio St.3d 350, 2007-Ohio-4277, 872 N.E.2d 279, ¶ 48.

*c. Analysis*

{¶ 108} Jackson challenges the validity of his jury waiver because he told the court during the waiver proceedings that his head was "banging" and he lacked focus, and defense counsel told the court that Jackson was a "little delusional."

{¶ 109} Jackson informed the trial judge in open court that he was waiving his right to a jury trial. This was all that was necessary to satisfy R.C. 2945.05. Further questioning was not required to ensure that Jackson understood all the rights to a jury trial that he was giving up. *See State v. Sanders*, 188 Ohio App.3d 452, 2010-Ohio-3433, 935 N.E.2d 905, ¶ 13-15 (10th Dist.).

{¶ 110} Moreover, Jackson does not challenge the waiver form that he signed waiving a jury trial. As previously discussed, a written waiver is presumptively voluntary, knowing, and intelligent. *Hunter*, 131 Ohio St.3d 67, 2011-Ohio-6524, 960 N.E.2d 955, at ¶ 49. Jackson's written waiver stated that he voluntarily waived his right to a jury and elected to be tried by a three-judge panel. The waiver acknowledged that he understood that he had the right to a "jury of twelve, and that no verdict could be made by a jury except by agreement of all twelve members of that jury." The waiver stated that "no threats or promises have been made to induce me to waive this right, and * * * I am not under the influence of any drugs, alcohol, or medication that would affect my

decision." Here, Jackson has failed to overcome the presumption that his written waiver was voluntarily, knowingly, and intelligently made.

{¶ 111} Nevertheless, Jackson argues that the trial court ignored his complaint that he had a headache during the waiver inquiry. But the trial court did not ignore Jackson's complaint and asked Jackson about his headache and feeling sick. Jackson replied that he was probably dehydrated, because he did not have anything to drink during lunch. The trial court then took steps to respond to Jackson's complaints. Jackson was given some water. The trial court also afforded Jackson the opportunity to take a break before the questioning proceeded. But Jackson said that he was all right and the inquiry continued. Under these circumstances, the trial court could accept Jackson's assurances and continue with the waiver inquiry.

{¶ 112} Jackson also complains that the trial court should have stopped the proceedings after he repeated that he had a headache and said, "I can't really focus right now." That comment was a continuation of his earlier complaint about being dehydrated. Moreover, neither Jackson nor counsel asked for a recess or a continuance. Thus, the court had no reason to interrupt its jury-waiver colloquy.

{¶ 113} Jackson argues that the trial court ignored defense counsel's statement that he was "delusional." Jackson interprets counsel's comment as raising a question whether he had a psychological problem. Accordingly, Jackson argues that the trial court should have called a recess and referred him to the court clinic for an evaluation. However, defense counsel's comment, "He's a little delusional," was followed by counsel's statement, "That is why we got the water." This shows that defense counsel was talking about Jackson's dehydration and not a psychological problem.

{¶ 114} Dr. Aronoff had found Jackson competent to stand trial. Jackson's complaints about having a headache and being unable to focus were not

sufficient to undermine that determination. The trial court could also rely on its own observations because Jackson had appeared before the court on previous occasions. Moreover, Jackson's own counsel never challenged Jackson's ability to understand the jury waiver. *See State v. Ketterer*, 111 Ohio St.3d 70, 2006-Ohio-5283, 855 N.E.2d 48, ¶ 72. "[F]actual determinations are best left to those who see and hear what goes on in the courtroom." *State v. Cowans*, 87 Ohio St.3d 68, 84, 717 N.E.2d 298 (1999).

{¶ 115} As a final matter, Jackson argues that the trial court's acceptance of his jury waiver after he had complained about his headache and defense counsel had stated that he was delusional constituted structural error.

{¶ 116} However, no error occurred in the trial court's acceptance of Jackson's jury waiver. Thus, we also reject Jackson's structural-error argument.

{¶ 117} Based on the foregoing, proposition of law No. II is overruled.

### 3. Jurisdiction and venue: offenses in different counties

### (proposition of law No. III)

{¶ 118} Jackson argues that the Cuyahoga County Grand Jury did not have jurisdiction to indict him for offenses occurring in Lorain and Erie Counties. He also argues that Cuyahoga County was not the proper venue in which to try the offenses committed outside Cuyahoga County.

*a. Background*

{¶ 119} In this case, the Cuyahoga County Grand Jury indicted Jackson for the robbery of a Howard Johnson's in Erie County (Counts 19 through 21) and the robbery of the Walgreens Drug Store in Lorain County (Counts 22 through 31). Notably, Jackson did not object during trial to the indictment for the offenses occurring in Erie or Lorain County or the trial court's venue or jurisdiction over those offenses.

*b. Analysis*

(1) Constitutional and statutory law

**{¶ 120}** The Ohio Constitution, Article I, Section 10, provides that "no person shall be held to answer for a capital, or otherwise infamous, crime, unless on presentment or indictment of a grand jury." R.C. 2939.08 sets forth the duties of a grand jury: "After the charge of the court of common pleas, the grand jury shall retire with the officer appointed to attend it, and proceed to inquire of and *present all offenses committed within the county*." (Emphasis added.)

**{¶ 121}** As to venue, Article I, Section 10 states that an accused is entitled to "a speedy trial by an impartial jury of the county in which the offense is alleged to have been committed."

**{¶ 122}** R.C. 2901.12, Ohio's venue statute, provides:

> (A) The trial of a criminal case in this state shall be held in a court having jurisdiction of the subject matter, and in the territory of which the offense or any element of the offense was committed.
>
> * * *
>
> (H) When an offender, as part of a course of criminal conduct, commits offenses in different jurisdictions, the offender may be tried for all of those offenses in any jurisdiction in which one of those offenses or any element of one of those offenses occurred. Without limitation on the evidence that may be used to establish the course of criminal conduct, any of the following is prima-facie evidence of a course of criminal conduct:
>
> (1) The offenses involved the same victim, or victims of the same type or from the same group.
>
> * * *

(5) The offenses involved the same or a similar modus operandi.

(6) The offenses were committed along the offender's line of travel in this state, regardless of the offender's point of origin or destination.

(2) Jurisdiction of the Cuyahoga County Grand Jury:

offenses in Erie and Lorain Counties

{¶ 123} In support of his argument that the Cuyahoga County Grand Jury lacked jurisdiction to indict him for offenses that occurred outside Cuyahoga County, Jackson cites *State v. Nevius*, 147 Ohio St. 263, 268-269, 71 N.E.2d 258 (1947).

{¶ 124} *Nevius* recognized: "A grand jury may inquire of and present only such offenses as have been committed within the county for which such grand jury was impaneled and sworn." *Id.* at 263. In *Nevius*, the defendant was charged with bribery that occurred in Clark County, where the indictment was returned and the trial had. *Id*. at 265. However, the state presented no evidence at trial showing where Nevius accepted the bribe. The only evidence was the defendant's testimony that the alleged bribe, an automobile, had been delivered to him in Montgomery County. *Id*. at 267. On appeal, this court concluded that there was a failure of proof that the defendant had accepted the bribe in Clark County and held that he should not have been indicted and tried for that offense in Clark County. *Id*. at 269.

{¶ 125} Jackson also cites *State v. Centers*, 5th Dist. Delaware No. 82-CA-38, 1983 WL 6551 (July 19, 1983), which followed the *Nevius* rationale and reversed a conviction for offenses that occurred outside Delaware County, where the grand jury was impaneled. In *Centers*, the Delaware County Grand Jury returned a multiple-count indictment for various felonies, none of which had

occurred within Delaware County. *Id.* at *1. In reversing the convictions, the court cited R.C. 2938.08, which the court said "plainly states that a Grand Jury's power to hear a cause is limited to offenses committed within the county." *Id.* at *2. The court added, "Failure to satisfy these provisions constitute[s] a failure of the Grand Jury to gain jurisdiction, or power, over the subject matter involved." *Id.*

{¶ 126} The state responds that the rationale of *State v. Ahmed*, 8th Dist. Cuyahoga No. 84220, 2005-Ohio-2999, supports a finding that the Cuyahoga County Grand Jury had authority to indict Jackson for offenses that occurred outside the county. *Ahmed* held that the Cuyahoga County Grand Jury had jurisdiction to indict the defendant for a series of sexual offenses that occurred in Cuyahoga, Geauga, and Summit Counties because all the offenses were part of the same course of criminal conduct that occurred in Cuyahoga County. *Id.* at ¶ 11.

{¶ 127} *Ahmed* relied on R.C. 2901.11, which grants jurisdiction to Ohio courts over criminal offenses that occur in Ohio. The statute provides that "[a] person is subject to criminal prosecution and punishment in this state if * * * [t]he person commits an offense under the laws of this state, any element of which takes place in this state." R.C. 2901.11(A)(1). Thus, the court concluded that the trial court had jurisdiction to proceed on all counts. *Id.* at ¶ 6.

{¶ 128} *Ahmed* emphasized that there was "no constitutional requirement that limits a grand jury from indicting only on offenses that occurred in the county in which it resides when the additional offenses presented are part of the same course of criminal conduct." *Id.* at ¶ 10. *Ahmed* also rejected arguments that R.C. 2939.08 governs jurisdiction: "This statute is not a jurisdictional statute; rather, it pertains to the duty of the grand jury. While the statute broadly defines the duty of the grand jury, it does not govern its exclusive authority." *Id.* at ¶ 8.

{¶ 129} *Ahmed* added that R.C. 2939.08 "cannot be considered in isolation" and should be viewed in conjunction with Ohio's venue statute, R.C. 2901.12. *Id*. at ¶ 8 and 14. *Ahmed* stated that R.C. 2901.12 recognizes the "modern mobility of criminal offenders." *Id*. at ¶ 9. The court also noted that R.C. 2901.12(H) provides that an offender who commits offenses in different counties as part of a course of criminal conduct may be tried in any one of those jurisdictions, *id*. at ¶ 9-10, and reasoned that "the same applies to the authority of the grand jury within those jurisdictions," *id*. at ¶ 10. Accordingly, *Ahmed* held that "a grand jury of one county has authority to indict on offenses occurring in other counties provided that those offenses are part of a course of criminal conduct." *Id*. at ¶ 11.

{¶ 130} In addition, *Ahmed* refused to apply *Nevius*, because there was no allegation in *Nevius* that the offenses occurred as part of a course of criminal conduct. And *Nevius* was decided before the enactment of R.C. 2901.12. *Id*. at ¶ 13.

{¶ 131} There is no constitutional or statutory provision that prohibited the Cuyahoga County Grand Jury from indicting Jackson for offenses that occurred in Erie and Lorain Counties as part of a course of criminal conduct that included crimes within Cuyahoga County. R.C. 2901.11 and 2901.12 permit a grand jury to indict an offender for offenses that occurred outside the county, provided that the offenses are part of the same course of criminal conduct that took place in the county in which the grand jury resides. *Ahmed* at ¶ 14.

{¶ 132} Here, Jackson and his accomplices committed six robberies between June 15 and 17, 2009, as part of a course of criminal conduct. Evidence demonstrated that these robberies were part of a course of conduct. The targets were small businesses (bars, laundries, and a motel); the crimes occurred late at night or early in the morning, when the victims were likely to be alone; and the crimes took place in a line of travel between Cuyahoga and Erie Counties. Thus,

the Cuyahoga County Grand Jury had jurisdiction to indict him for the offenses that occurred in Erie and Lorain Counties, and venue for those offenses was proper in Cuyahoga County.

(3) Sufficiency of the indictment

{¶ 133} Jackson further challenges the sufficiency of the indictment because the grand jury did not specify that the offenses charged in Counts 19 through 21 occurred in Erie County and that the offenses charged in Counts 22 through 30 occurred in Lorain County.

{¶ 134} The indictment states that it is a true bill indictment for attempted murder and 41 additional counts that occurred from "06/02/2009 to 06/18/2009." The preamble to Count 1 (the attempted murder of Stanley Bentley) of the 42-count indictment then states: "The Jurors of the Grand Jury of the State of Ohio, within and for the body of the County aforesaid, on their oaths, IN THE NAME AND BY THE AUTHORITY OF THE STATE OF OHIO, do find and present, that the above named Defendant(s), on or about the date of the offense set forth above, *in the County of Cuyahoga, and/or Erie and/or Lorain*, unlawfully * * *." (Emphasis added. Capitalization sic.)  Counts 19 through 21 do not specify that the offenses occurred in Erie County, and Counts 22 through 30 do not specify that the offenses occurred in Lorain County.

{¶ 135} R.C. 2941.08(F) provides that an indictment is not invalid "[f]or the want of an allegation of the time or place of a material fact when the time and place have been once stated therein."  In *State v. Williams*, 53 Ohio App.3d 1, 4, 557 N.E.2d 818 (10th Dist.1988), the court relied on R.C. 2941.08(F) in holding that it was sufficient to allege once in a 12-count indictment that the offense had occurred in Franklin County.  *See also State v. White*, 8th Dist. Cuyahoga No. 95066, 2011-Ohio-4089, ¶ 15-16.

{¶ 136} In the present case, the indictment states that the offense occurred "in the County of Cuyahoga, and/or Erie and/or Lorain."  But it fails to specify

which of the counts occurred in Erie and Lorain Counties. R.C. 2941.08(F) does not apply, because none of the counts "once stated" that they occurred in Erie or Lorain Counties. Thus, Counts 19 through 21 and Counts 22 through 30 do not comport with R.C. 2941.08(F).

{¶ 137} However, Jackson failed to object to the indictment at trial. We have held that "when a defendant fails to object to an indictment that is defective because the indictment did not include an essential element of the charged offense, a plain error analysis is appropriate." *State v. Colon*, 119 Ohio St.3d 204, 2008-Ohio-3749, 893 N.E.2d 169, ¶ 7; *see also State v. Frazier*, 73 Ohio St.3d 323, 332, 652 N.E.2d 1000 (1995). Thus, we must analyze each of the defective counts separately to determine both whether it reflects an "obvious" error, *State v. Barnes*, 94 Ohio St.3d 21, 27, 759 N.E.2d 1240 (2002), and whether " 'but for [that] error, the outcome of the trial clearly would have been otherwise,' " *State v. Lang*, 129 Ohio St.3d 512, 2011-Ohio-4215, 954 N.E.2d 596, ¶ 108, quoting *State v. Long*, 53 Ohio St.2d 91, 372 N.E.2d 804 (1978), paragraph two of the syllabus.

{¶ 138} The state provided a detailed bill of particulars that set out the location of the offenses. Thus, no plain error exists as to any of these counts.

{¶ 139} Jackson asserts that the grand jury made no findings that the offenses in Erie and Lorain Counties were part of a course of criminal conduct together with the offenses that occurred in Cuyahoga County. Jackson argues, without citation to authority, that the grand jury's failure to find a course of criminal conduct invalidates the indictment as to those offenses.

{¶ 140} The purpose of a grand-jury indictment is to give notice to the accused. *See State v. Horner*, 126 Ohio St.3d 466, 2010-Ohio-3830, 935 N.E.2d 26, ¶ 10. Crim.R. 7(B) explains the structure and sufficiency requirements of an indictment:

> The statement [that the defendant has committed an offense] may be made in ordinary and concise language without technical averments or allegations not essential to be proved. The statement may be in the words of the applicable section of the statute, provided the words of that statute charge an offense, or in words sufficient to give the defendant notice of all the elements of the offense with which the defendant is charged.

{¶ 141} Here, none of the offenses that Jackson allegedly committed in Erie and Lorain Counties included the proof of a course of criminal conduct as an essential element of the offense. Thus, the indictment was not required to include such language. Defense counsel also failed to object to this alleged flaw in the indictment at trial and waived all but plain error. We have concluded that no plain error occurred, and this argument is not well taken.

(4) Venue

{¶ 142} Jackson also questions whether the court had venue to try these offenses. Jackson argues that the state failed to establish that the offenses that occurred in Erie and Lorain Counties were part of a criminal course of conduct that included crimes in Cuyahoga County. But again, Jackson failed to object to venue at trial and thus waived all but plain error. *See State v. Weber*, 2d Dist. Montgomery No. 25508, 2013-Ohio-3172, ¶ 33 (defendant's failure to object at trial that the state failed to prove the offense occurred in the county where he was tried constitutes waiver of the issue); *State v. Loucks*, 28 Ohio App.2d 77, 82, 274 N.E.2d 773 (4th Dist.1971).

{¶ 143} Venue is not a material element of any offense charged. *State v. Smith*, 87 Ohio St.3d 424, 435, 721 N.E.2d 93 (2000), citing *State v. Headley*, 6 Ohio St.3d 475, 477, 453 N.E.2d 716 (1983). The elements of the offense charged and the venue of the matter are separate and distinct. *State v. Draggo*, 65

Ohio St.2d 88, 90, 418 N.E.2d 1343 (1981). Nevertheless, venue is a fact that must be proved beyond a reasonable doubt unless it is waived by the defendant. *Headley* at 477.

{¶ 144} Trial courts have broad discretion to determine the facts that would establish venue. *Toledo v. Taberner*, 61 Ohio App.3d 791, 793, 573 N.E.2d 1173 (6th Dist.1989). Venue need not be proven in express terms; it may be established either directly or indirectly by all the facts and circumstances of the case. *Headley* at 477.

{¶ 145} R.C. 2901.12(H) recognizes that an offender who commits offenses in different jurisdictions as part of a course of criminal conduct may be tried in any one of those jurisdictions. Thus, as long as there was evidence from which the trial court could have determined beyond a reasonable doubt that one of the alleged offenses was committed in Cuyahoga County as part of a course of criminal conduct, then venue was properly established. *See State v. Beuke*, 38 Ohio St.3d 29, 41, 526 N.E.2d 274 (1988).

{¶ 146} Prima facie evidence of a course of criminal conduct may be established through proof that the offenses involved victims of the same type, R.C. 2901.12(H)(1); involved the same or similar modus operandi, (H)(5); or were committed along the offender's line of travel in the state, regardless of the offender's point of origin or destination, (H)(6).

{¶ 147} As previously discussed, evidence was presented showing that Jackson and his accomplices committed six robberies between June 15 and 17, 2009, as part of a course of criminal conduct. The robberies were part of a pattern and took place along a line of travel between Cuyahoga and Erie Counties. Testimony was also presented that properly identified the location of each of these offenses. Thus, venue was properly established, and no error occurred.

{¶ 148} Based on the foregoing, we overrule proposition of law No. III.

4. Shackling (proposition of law No. IV)

{¶ 149} Jackson argues that the trial court abused its discretion by having him shackled without first establishing the necessity for shackles.

a. Background

{¶ 150} Defense counsel filed a pretrial motion to allow Jackson to appear at trial without restraints, and the trial court granted that motion. Nevertheless, Jackson's legs remained shackled throughout the trial.

{¶ 151} When the trial began, defense counsel complained about Jackson's being handcuffed in court, because he was having a difficult time writing and maneuvering. In response, the trial court stated:

THE COURT: Deputy Evelyn, simply remove the handcuffs so that Mr. Jackson can write with his pencil, okay?

DEPUTY SHERIFF: Your Honor, I'm required to have some restraint on him. Could you put two cuffs on him or a pair of shackles?

THE COURT: By shackles you are referring to the legs?

DEPUTY SHERIFF: Yes, you Honor.

THE COURT: Well, you mentioned using two handcuffs that is because that gives —

DEPUTY SHERIFF. A wider spread.

THE COURT: More mobility with his hands; is that what you're saying?

DEPUTY SHERIFF: It will, but it's not our prescribed way, really.

THE COURT: Well, we need to do something to facilitate the fact that he's going to have difficulty writing and taking notes and communicating in writing with his counsel.

So, Mr. Mullen (defense counsel), could you confer with your client of the various methods that ha[ve] been mentioned [and] just decide how you would find it most comfortable?

But I would like Mr. Jackson to be comfortable and have the ability to write, take notes and communicate in writing with his counsel.

MR. MULLEN:  If leg irons are available, that would be preferable, your Honor, and he's still secure.

THE COURT:  So under that mechanism there will be no handcuffs.  There would only be ankle cuffs; is that right?

DEPUTY SHERIFF:  Yes, your Honor.

THE COURT:  Is that what you prefer, Mr. Jackson?

THE DEFENDANT:  Yes, Ma'am.

THE COURT:  Okay.  That is what we'll do.  Thank you.


{¶ 152} The trial court later noted that Jackson's handcuffs were removed and he was placed in ankle shackles.  The trial court also filed a journal entry stating that the "sheriff [is] to remove handcuffs from defendant and place shackles on defendant's ankles while in trial in courtroom 16-B."

b. Analysis

{¶ 153} In a jury trial, a criminal defendant has the right to remain free of physical restraints that are visible to the jurors.  *Deck v. Missouri*, 544 U.S. 622, 628-629, 125 S.Ct. 2007, 161 L.Ed.2d 953 (2005)  That right may be overcome in a particular instance by the need for physical security, escape prevention, or courtroom decorum.  *Id*.; *State v. Franklin*, 97 Ohio St.3d 1, 2002-Ohio-5304, 776 N.E.2d 26, ¶ 79.  The decision to impose such restraints is left to the trial court's sound discretion.  *State v. Richey*, 64 Ohio St.3d 353, 358, 595 N.E.2d 915 (1992).  In *Franklin*, this court stated that while "the preferred and encouraged practice

prior to handcuffing a defendant during any phase of trial is to hold a hearing on the matter, we do not find this to be an absolute rule." *Franklin* at ¶ 82.

{¶ 154} First, Jackson argues that the trial court should have conducted a hearing and made findings to justify the use of shackles. However, Jackson's trial occurred before a three-judge panel rather than a jury, meaning that any physical restraints were not visible to a jury. Unlike in a jury trial, it is presumed that the members of a three-judge panel are able to disregard the defendant's appearing before them in shackles. *See State v. Post*, 32 Ohio St.3d 380, 384, 513 N.E.2d 754 (1987) (it is a usual presumption that in a bench trial, the court considers only the relevant, material, and competent evidence in arriving at its judgment unless it affirmatively appears to the contrary). No prejudice occurred when Jackson appeared in shackles before the three-judge panel. *See also Fautenberry v. Mitchell*, 515 F.3d 614, 642-643 (6th Cir.2008) (Ohio capital defendant not prejudiced by appearing in front of a judge in shackles).

{¶ 155} Nevertheless, Jackson argues that the presiding judge's order placing him in restraints showed her inability to presume Jackson's innocence. But his position is not supported in the record. Thus, it is rejected.

{¶ 156} Second, he argues that he was prejudiced because his restraints were visible to the witnesses. This argument seems to imply that one or more of the witnesses might have changed their testimony after they saw the defendant in shackles. Jackson mentions that Jennifer Testa, the bartender at the Brickhouse Bar, identified him in court by stating, "He has a goatee. He's sitting right there. He has cuffs on his ankles." However, Jackson does not allege that Testa misidentified him because he was wearing shackles. Jackson also does not specify other witnesses whose testimony may have been affected by his shackling. This argument is also rejected.

{¶ 157} Third, Jackson argues that the shackles infringed upon his right to effective assistance of counsel. But the trial court ordered the removal of

Jackson's handcuffs and used ankle shackles instead, and by doing so, the court ensured that Jackson's ability to take notes and consult with counsel was not hindered. *See Deck*, 544 U.S. at 630, 125 S.Ct. 2007, 161 L.Ed.2d 953 (shackling can interfere with the accused's ability to communicate with his lawyer). We also reject this argument.

{¶ 158} As a final matter, Jackson argues that the trial court improperly deferred to security personnel in ordering him shackled. "The trial court must exercise its own discretion and not leave the issue up to security personnel." *State v. Adams*, 103 Ohio St.3d 508, 2004-Ohio-5845, 817 N.E.2d 29, ¶ 104. The deputy sheriff informed the court that handcuffs were the "prescribed way" for restraining the accused. But the trial court ordered handcuffs removed and had Jackson placed in ankle shackles. Thus, the trial court did not leave the decision on the mode of restraints to security personnel.

{¶ 159} Based on the foregoing, proposition of law No. IV is overruled.

5. Failure to advise Jackson of his Fifth Amendment

rights before testifying (proposition of law No. V)

{¶ 160} Jackson argues that the trial court's failure to advise him of his Fifth Amendment rights before he testified resulted in his invalid waiver of those rights.

{¶ 161} Jackson testified in his own behalf during the guilt phase of the proceedings. The trial court did not advise Jackson of his Fifth Amendment rights before he testified.

{¶ 162} In *State v. Bey*, 85 Ohio St.3d 487, 499, 709 N.E.2d 484 (1999), we held that a trial court did not have to conduct an inquiry to determine whether a defendant knowingly and intelligently waived his right to testify in his own behalf. *See also United States v. Webber*, 208 F.3d 545, 551 (6th Cir.2000) ("Barring any statements or actions from the defendant indicating disagreement with counsel or the desire to testify, the trial court is neither required to sua sponte

address a silent defendant and inquire whether the defendant knowingly and intentionally waived the right to testify, nor ensure that the defendant has waived the right on the record").

{¶ 163} *Bey* stated that an inquiry was not only unnecessary but might be harmful because it " 'places the judge between the lawyer and his client and can produce confusion as well as delay.' " *Id.* at 499, quoting *Underwood v. Clark*, 939 F.2d 473, 476 (7th Cir.1991). *Bey* warned that such questioning could "lead into the judge's evaluation of the wisdom of the defendant's decision, the substance of the testimony, or simply evoke a dramatic change in a previously carefully considered trial strategy." *Id.*, citing *United States v. Goodwin*, 770 F.2d 631, 636 (7th Cir.1985). *Bey* also noted that nothing in the record suggested that the defendant was unaware of his right to testify or that defense counsel failed to advise him of that right. *Id.*

{¶ 164} Here, Jackson asserts that the trial court was required to inquire into the voluntariness of his waiver of his right *not to testify*, the corollary of Jackson's right to testify. Other courts have held that a trial court is not required to develop a record to establish that a defendant has voluntarily waived his right not to testify. *E.g., United States v. Yono*, 605 F.3d 425, 426 (6th Cir.2010); *Brown v. Artuz*, 124 F.3d 73, 79 (2d Cir.1997); *United States v. Martinez*, 883 F.2d 750, 756-757 (9th Cir.1989), *vacated on other grounds*, 928 F.2d 1470 (1991) (collected cases); *State v. Thomas*, 128 Wash.2d 553, 559, 910 P.2d 475 (1996) (en banc).

{¶ 165} Courts have applied a similar rationale to what was discussed in *Bey*, in holding that a trial court is not required to conduct an inquiry into the defendant's decision not to testify. First,

[i]t is primarily the responsibility of counsel, not the judge, to advise a defendant on whether or not to testify, and the tactical

advantages and disadvantages of each choice. * * * [T]he decision is a matter of trial strategy between the defendant and counsel; the court should not interfere. There is also a danger that the judge will appear to encourage the defendant to invoke or to waive this right. This danger is of great significance because the right not to testify counterpoises the right to testify, and the exercise of one is the waiver of the other.

(Citations omitted.) *Martinez* at 757.

{¶ 166} Jackson cites *Boykin v. Alabama*, 395 U.S. 238, 89 S.Ct. 1709, 23 L.Ed.2d 274 (1969), in arguing that the trial court was required to make a record to affirmatively establish that he voluntarily waived his Fifth Amendment right not to testify. In *Boykin*, the Supreme Court held that it was plain error to accept a guilty plea without an affirmative showing that it was intelligent and voluntary. *Id*. at 243. The court held that a defendant must be advised of his or her constitutional rights, including the privilege against compulsory self-incrimination, the right to a trial by jury, and the right to confront one's accusers before a waiver of those rights is valid. *Id*.

{¶ 167} In *Webber*, 208 F.3d at 551-552, the Sixth Circuit addressed similar arguments in rejecting the claim that the trial court must conduct an inquiry to ensure that the defendant has intelligently and voluntarily waived his right to testify:

While we recognize that trial courts are required to inquire directly of the defendant in regard to whether the defendant is knowingly and intentionally entering a plea of guilty, waiving a jury trial, or foregoing the assistance of counsel, * * * we are convinced that the right to testify 'qualitatively differs' from those rights in that a *sua*

*sponte* inquiry from the trial judge regarding the defendant's choice to testify might impede on an appropriate defense strategy, might lead the defendant to believe that defense counsel has been insufficient, or might inappropriately influence the defendant to waive the Fifth Amendment right *not* to testify.

(Emphasis sic.)

{¶ 168} The same rationale applies here. Thus, we reject Jackson's claim that *Boykin* required the trial court to conduct an inquiry before he testified.

{¶ 169} Jackson also alleges, without citing any authority, that the trial court's failure to conduct an inquiry constituted structural error. However, such an inquiry was not required. Thus, we reject his structural error argument.

{¶ 170} Finally, even if the court should have made inquiry, Jackson has not presented any evidence to suggest that his decision to testify was made unknowingly or involuntarily.

{¶ 171} Based on the foregoing, we overrule proposition of law No. V.

6. Ineffective assistance of counsel (proposition of law No. VI)

{¶ 172} Jackson argues that his counsel provided ineffective assistance by failing to properly raise and present each of the issues set forth in proposition of law Nos. I through V.

{¶ 173} Reversal of a conviction for ineffective assistance requires that the defendant show, first, that counsel's performance was deficient and, second, that the deficient performance prejudiced the defense so as to deprive the defendant of a fair trial. *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). *Accord State v. Bradley*, 42 Ohio St.3d 136, 538 N.E.2d 373 (1989), paragraph two of the syllabus.

{¶ 174} First, Jackson argues that his counsel were ineffective by failing to participate in the *Atkins* hearing conducted by the trial court. Jackson refers to

his argument in proposition of law No. I, in which he claimed that counsel failed to adequately investigate his adaptive functioning, the second part of the *Atkins* test.

{¶ 175} In evaluating the performance of counsel,

> strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation.

*Strickland* at 690-691.

{¶ 176} The record shows that counsel's decision regarding the *Atkins* inquiry did not result from any lack of investigation. Defense counsel informed the court that they had consulted Dr. Fabian about the possibility of raising an *Atkins* claim and concluded that such a claim could not be supported. Dr. Fabian confirmed that advice during his testimony.

{¶ 177} Dr. Fabian had ample qualifications and experience to determine whether Jackson met the *Atkins* test for mental retardation. Dr. Fabian referred to the *Atkins* test during his testimony. Moreover, Dr. Fabian has testified about mental retardation in numerous capital cases. *See State v. White*, 118 Ohio St.3d 12, 2008-Ohio-1623, 885 N.E.2d 905, ¶ 10; *State v. Lawson*, 12th Dist. Clermont No. CA2007-12-116, 2008-Ohio-6066, ¶ 15; *State v. Stallings*, 9th Dist. Summit No. 21969, 2004-Ohio-4571, ¶ 12-13. Thus, Jackson has failed to establish that his counsel were deficient in relying on Dr. Fabian's opinion that he was not mentally retarded.

{¶ 178} Jackson argues that a full-scale adaptive-functioning test along with his full-scale IQ of 75 might have established that he was mentally retarded.

However, Jackson provides nothing to support this claim. Moreover, Dr. Aronoff testified that Jackson did not meet the first part of the *Atkins* test.

{¶ 179} Jackson also cites *United States v. Hardy*, 762 F.Supp.2d 849 (E.D.La.2010), in arguing that defense counsel were required to investigate his adaptive functioning before deciding not to raise an *Atkins* claim. In *Hardy*, expert testimony established that the defendant met all three parts of the *Atkins* test and was mentally retarded. *Id.* at 878-879, 896, and 904. Unlike in *Hardy*, Dr. Fabian and Dr. Aronoff testified that Jackson did not possess significantly subaverage intellectual functioning, the first part of the *Atkins* test. Thus, any failure to conduct an adaptive-functioning test made no difference.

{¶ 180} In conclusion, we reject this ineffectiveness claim because defense counsel obtained expert advice before deciding not to raise an *Atkins* claim. *State v. Elmore*, 5th Dist. Licking No. 2005-CA-32, 2005-Ohio-5940, ¶ 50.

{¶ 181} Second, Jackson argues that his counsel were ineffective by failing to object to continuing with the jury-waiver inquiry after counsel described Jackson as delusional.

{¶ 182} Jackson told the court that he had a headache during the jury-waiver inquiry. But he explained that he was "probably dehydrated" because he had not been drinking any liquids. Jackson was given some water. He then assured the court that he was all right and wanted to continue with the inquiry. After Jackson complained about headaches again, defense counsel interjected, "He's a little delusional. That is why we got the water. He ate, but I don't think he had any water."

{¶ 183} As discussed in relation to proposition of law No. II, defense counsel's statement in its entirety shows that counsel was talking about Jackson's dehydration and not a psychological problem. Jackson had been evaluated and found competent to stand trial. Moreover, there is no evidence indicating that he

suffered from any type of debilitating mental disorder that might have affected his ability to waive a jury trial. *See State v. Leonard*, 8th Dist. Cuyahoga No. 86310, 2006-Ohio-1943, ¶ 32 (defendant's headaches were not a mental illness so debilitating that they affected his ability to enter a valid guilty plea). Under these circumstances, Jackson fails to establish that his counsel were ineffective by failing to object to continuing the waiver inquiry.

**{¶ 184}** Third, Jackson argues that his counsel were ineffective by failing to challenge the court's jurisdiction over offenses occurring outside Cuyahoga County. As discussed in relation to proposition of law No. III, no constitutional or statutory provisions prohibited the Cuyahoga County Grand Jury from indicting Jackson for offenses that occurred in Erie and Lorain Counties, because these offenses were part of a course of criminal conduct in which some of the conduct occurred in Cuyahoga County. Thus, we reject this ineffectiveness claim.

**{¶ 185}** Fourth, Jackson argues that trial counsel were ineffective by failing to object to his shackling. The record shows that defense counsel filed a pretrial motion to allow Jackson to appear at trial without restraints. But defense counsel did not renew that motion after Jackson waived his right to a jury trial and elected to be tried before a three-judge panel.

**{¶ 186}** Unlike a jury trial, it is presumed that the members of a three-judge panel are able to disregard the defendant's appearing before them in shackles. *See Post*, 32 Ohio St.3d at 384, 513 N.E.2d 754; *Fautenberry*, 515 F.3d at 642-643. Thus, we reject this ineffectiveness claim.

**{¶ 187}** Finally, Jackson argues that his counsel were deficient by failing to ensure that he understood his Fifth Amendment rights before testifying. However, as explained in relation to proposition of law No. V, the trial court was not required to advise Jackson of his Fifth Amendment right not to testify before he took the stand. *See Yono*, 605 F.3d at 426. Thus, we also reject this ineffectiveness claim.

{¶ 188} Based on the foregoing, we overrule proposition of law No. VI.

*B. Penalty-phase issues*

1. Prosecutorial misconduct (proposition of law No. VII)

{¶ 189} Jackson argues that prosecutorial misconduct occurred during various points of his penalty-phase closing argument. However, Jackson failed to object during argument and thus waived error unless the remarks denied him a fair trial. *See State v. Wade*, 53 Ohio St.2d 182, 373 N.E.2d 1244 (1978), paragraph one of the syllabus.

{¶ 190} The test for prosecutorial misconduct is whether the remarks were improper and, if so, whether they prejudicially affected the accused's substantial rights. *State v. Smith*, 14 Ohio St.3d 13, 14, 470 N.E.2d 883 (1984). The touchstone of the analysis "is the fairness of the trial, not the culpability of the prosecutor." *Smith v. Phillips*, 455 U.S. 209, 219, 102 S.Ct. 940, 71 L.Ed.2d 78 (1982).

{¶ 191} First, Jackson argues that the prosecutor's closing argument improperly discussed Jackson's role in committing the robberies outside Cuyahoga County.

{¶ 192} During his penalty-phase opening statement, defense counsel asserted that "alcohol, PCP, drugs, drugs, drugs, drugs * * * are certainly a strong mitigating factor." At the mitigation hearing, Dr. Fabian testified that Jackson's "low intelligence" and "his substance dependence and intoxicated state at the time of the offenses could be considered mitigating." In his unsworn statement, Jackson stated, "I know it was stupid * * * and I have to come up here and say it's drugs and all of that but it was just—I let evil get ahold of me, * * * basically I let that demon get inside of me."

{¶ 193} During his penalty-phase closing argument, the prosecutor rebutted defense claims that Jackson's low intelligence, substance dependence, and intoxicated state at the time of the murder were mitigating, by contrasting his

behavior at Howard Johnson's and Walgreens with his conduct at the Soap Opera Laundry:

> Mr. Jackson on June 18th 2009 has done a few things that demonstrate how devious he is. *He does a few things to demonstrate that he's not under the influence when he does the Soap Opera Laundry murder, robbery and murder.*

> Recall what he's wearing on June 18th. He has changed his appearance from the prior robberies. He now looks completely different.

> Look at and recall what he looks like in the Walgreens robbery and in the Howard Johnson's robbery, and I only point those out just as a matter of comparison, and look at what he looks like in the Soap Opera Laundry robbery.

> He has a hat pulled over his head, big jacket on, book bag slung over his shoulder. Totally different appearance.

> If you were to look at those two people in those two surveillance tapes you wouldn't be able to say yes, that is Jeremiah Jackson in Walgreen's and yes, a day later, that is Jeremiah Jackson in the Soap Opera Laundry.

> You wouldn't be able to between Howard Johnson's and Walgreens. You wouldn't be able to say with the Super Wash. But he's changed his appearance.

> That takes some thought. That takes some planning. That shows you his devious nature.

(Emphasis added.)

52

**{¶ 194}** The prosecutor then discussed the methodical nature of Jackson's actions at the Soap Opera Laundry and highlighted the difference with the earlier robberies:

> Those are steps that are planned out, are thought out, and cut against any sort of thought that he's high on PCP and he does not know what he's doing.
>
> He's methodical about casing this place. He changes his appearance, changes his car and changes his MO with regards to how he's going to rob the Soap Opera Laundry and how it will be different than his robberies of the other places.

**{¶ 195}** The prosecutor then rebutted Dr. Fabian's conclusion that Jackson's cognitive impairment and borderline range of intellectual functioning were mitigating factors:

> [N]othing that we heard in testimony, in evidence, again, with the planning that would suggest that he's borderline intellectually functioning and the holding up in Sandusky, the coming back and forth, the planning with regard to these other robberies all show good planning, good leadership in terms of execution of these plans.

**{¶ 196}** Thereafter, the prosecutor addressed defense claims that the aggravating circumstances are mitigated by Jackson's substance abuse:

> Again, if you look at the actual crimes themselves, how they were committed and the planning that goes into it, the calling

of Katrina over to the hotel, the going in, the robbing, the duct taping, all those, slice against him being high and out of his mind because they're so precise and definite in their planning and the carrying out of their plans to rob these places.

Super Wash we find out is actually an inside job, almost, with regards to Katrina. That shows that during this period of time we were led to believe that he's high, out of his mind, and that his drug abuse led to all this.

There is definite planning and definitely cuts against that at the time of the offense that he was demented, on any of these substances, to the point where they affected him and did not—and made him not know what right from wrong is.

**{¶ 197}** "Prosecutors can urge the merits of their cause and legitimately argue that defense mitigation evidence is worthy of little or no weight." *State v. Wilson*, 74 Ohio St.3d 381, 399, 659 N.E.2d 292 (1996). Moreover, "counsel for both parties are afforded wide latitude during closing argument." *State v. Brown*, 38 Ohio St.3d 305, 317, 528 N.E.2d 523 (1988).

**{¶ 198}** Jackson argues that the prosecutor's argument about the other robberies was an improper discussion about nonstatutory aggravating factors. However, the prosecutor did not characterize any of the facts of the other robberies as aggravating circumstances. The context of the prosecutor's remarks show that his comments about Jackson's leadership and behavior in committing the other robberies were used to challenge Jackson's claim that substance abuse and borderline intellectual functioning were mitigating factors. *See Ketterer*, 111 Ohio St.3d 70, 2006-Ohio-5283, 855 N.E.2d 48, at ¶ 168. The prosecutor's remarks represented fair comment, and no plain error occurred.

{¶ 199} Furthermore, the three-judge panel is presumed to have " 'considered only the relevant, material, and competent evidence in arriving at its judgment unless it affirmatively appears to the contrary.' " *Post*, 32 Ohio St.3d at 384, 513 N.E.2d 754, quoting *State v. White*, 15 Ohio St.2d 146, 151, 239 N.E.2d 65 (1968). Thus, even assuming that the prosecutor's comments about the other robberies were improper, we hold that plain error did not occur.

{¶ 200} Second, Jackson asserts that the state improperly argued the uncharged aggravating circumstance of killing a witness.

{¶ 201} During the penalty-phase closing arguments, the prosecutor discussed Jackson's attempted murder of Christy Diaz as part of the course-of-conduct specification and had the following exchange with the trial court:

> And when we talk about course of conduct, this course of conduct is very—the angle on this course of conduct has to be not only that he killed somebody and that he tried to kill a second person in this case, but he killed somebody and he tried to kill a witness. He tried to kill a witness to the first killing.
>
> And the specification's included in our Ohio revised code for killing a witness. The only reason that that wasn't presented is because she, by the grace of God, ducked and survived.
>
> So that course of conduct isn't just he killed two people in the course of a robbery or he killed two people in the course of whatever, he killed one person and tried to kill the other person that was a witness to his crime.
>
> THE COURT: Let's just be perfectly clear. You're not by saying that, are you, arguing an additional aggravating circumstance out of R.C. 2929.04(A) which this gentleman wasn't indicted on, hasn't be[en] proven?

MR. AWADALLAH (the prosecutor): Absolutely not, your Honor.

THE COURT: Okay.

MR. AWADALLAH: I'm merely pointing out the angle and the importance of this course of conduct in that a witness strikes at the core of what we do here, the core of the justice system, when we try to kill witnesses to crimes.

The specification itself hadn't resulted in the death of the witness. That is why he wasn't charged.

I'm only merely mentioning it to highlight why this course of conduct and the action within this course of conduct merit and will outweigh on it's [sic] own any mitigating factors presented during these two phases.

That on it's [sic] own mitigates or outweighs any mitigation.

{¶ 202} As we explained in *State v. Sheppard*, 84 Ohio St.3d 230, 703 N.E.2d 286 (1998), although

prosecutors cannot argue that the nature and circumstances of an offense are aggravating circumstances, the facts and circumstances of the offense must be examined to determine whether they are mitigating. R.C. 2929.04(B). Thus, a prosecutor may legitimately refer to the nature and circumstances of the offense, both to refute any suggestion that they are mitigating and to explain why the specified aggravating circumstance[s] outweigh mitigating factors.

*Id.* at 238.

{¶ 203} The prosecutor's argument that Jackson attempted to murder Diaz to eliminate her as a witness addressed Jackson's motive for trying to kill her. *See State v. Gumm*, 73 Ohio St.3d 413, 422-423, 653 N.E.2d 253 (1995) (prosecutor may comment on defendant's motive in addressing the nature and circumstances of the statutory aggravating circumstance of felony-murder as set forth in R.C. 2929.04(A)(7)).

{¶ 204} Under questioning, the prosecutor assured the court that he was not trying to argue another aggravating circumstance. That colloquy referred to R.C. 2929.04(A)(8), the witness-murder specification, which includes aggravated murders committed to "prevent the victim's testimony in any criminal proceeding."

{¶ 205} Nevertheless, the prosecutor did more than just identify Jackson's motive. He speculated that Jackson would have been charged with the (A)(8) specification if he had killed Diaz. The prosecutor also stressed that Jackson's "action within this course of conduct merit and will outweigh on its own any mitigating factors presented during these two phases." This argument shifted focus from the course-of-conduct specification, which was charged and proven, to factors that were not charged.

{¶ 206} In *State v. Baston*, 85 Ohio St.3d 418, 709 N.E.2d 128 (1999), we addressed similar allegations of prosecutorial misconduct. In that case, the defendant was charged with a R.C. 2929.04(A)(7) aggravated-robbery specification. During penalty-phase closing arguments, the prosecutor said, "[A]nd what we have to look at are the aggravating factors that were committed in this case * * *. This was not—this was not any kind of an attempt to do anything but eliminate a witness." *Id.* at 426. *Baston* held that the prosecutor's argument was improper. As in the present case, the defendant was not charged with killing a witness. Thus, *Baston* stated, "The prosecutor should have focused on the

statutory factor, which was charged and proven in the trial phase, and not on factors that were not charged." *Id*. at 427.

{¶ 207} The prosecutor's argument in this case was also improper. Nevertheless, the three-judge panel was not misled by the prosecutor's argument and understood that they were not also considering the witness-murder specification in imposing sentence. Moreover, there is no showing that the panel considered anything other than the relevant, material, and competent evidence in arriving at its decision. *Post*, 32 Ohio St.3d at 384, 513 N.E.2d 754. Thus, no plain error occurred.

{¶ 208} As a final matter, Jackson claims that the prosecutor improperly commented upon Jackson's behavior in prison, because Jackson never presented his prison behavior as a mitigating factor. Yet nothing in the record shows that the prosecutor commented upon Jackson's behavior in prison. Thus, we also reject this claim.

{¶ 209} Based on the foregoing, we overrule proposition of law No. VII.

2. Ineffective assistance of counsel

(proposition of law No. VIII)

{¶ 210} Jackson argues that his counsel were ineffective by failing to adequately prepare mitigation during the penalty phase of the trial and by failing to object to prosecutorial misconduct during the state's closing argument.

{¶ 211} First, Jackson argues that his counsel were not prepared to present mitigating evidence. Jackson states that his counsel were inexperienced in trying death-penalty cases. Jackson also mentions that defense counsel informed the court during a pretrial hearing that they were "overwhelmed with discovery," and that co-counsel mentioned that they were in the "embryonic stages of the investigation" only two months before trial began.

{¶ 212} An attorney's failure to reasonably investigate a defendant's background and present mitigating evidence to the jury at sentencing can

constitute ineffective assistance of counsel. *Wiggins v. Smith*, 539 U.S. 510, 521-522, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003). "Defense counsel has a duty to investigate the circumstances of his client's case and explore all matters relevant to the merits of the case and the penalty, including the defendant's background, education, employment record, mental and emotional stability, and family relationships." *Goodwin v. Johnson*, 632 F.3d 301, 318 (6th Cir.2011). However, Jackson has the burden of demonstrating that his counsel rendered ineffective assistance by failing to conduct an adequate investigation. *Hunter*, 131 Ohio St.3d 67, 2011-Ohio-6524, 960 N.E.2d 955, at ¶ 104, citing *Strickland*, 466 U.S. at 687, 104 S.Ct. 2052, 80 L.Ed.2d 674.

{¶ 213} On January 19, 2010, defense counsel filed a motion requesting a continuance of the trial date. During a pretrial hearing on January 25, 2010, defense counsel mentioned that the defense was "overwhelmed with discovery" as one of several reasons for requesting a continuance. Edward Mullen, the lead defense counsel, added, "[M]y co-counsel, George George, with the Public Defender's Office, this is the first time he would be going to trial on a death penalty case. This is my first lead counsel assignment." George also indicated that the public defender's office had only been involved with the case since September 2009.

{¶ 214} The trial court also asked about the progress of the defense's investigator. George replied, "He's been working on it. I don't know to the extent. We're very in the embryonic stages of the investigation." After the trial court expressed concern about that comment, Mullen stated, "That's a phrase that George George uses, I don't know that that is fair." Thereafter, the court set a trial date for March 22, 2010.

{¶ 215} As an initial matter, defense counsel's lack of experience in serving as lead counsel in a death-penalty case does not establish ineffective assistance. Rather, trial counsel's performance is reviewed under the two-

pronged *Strickland* analysis. *See Hunter*, 131 Ohio St.3d 67, 2011-Ohio-6524, 960 N.E.2d 955, at ¶ 39-40; *People v. Williams*, 56 Cal.4th 630, 691-692, 156 Cal.Rptr.3d 214, 299 P.3d 1185 (2013) (although defense counsel never handled a capital case that included a penalty phase, this does not in and of itself establish deficient performance); *Wisehart v. State*, 693 N.E.2d 23, 43 (Ind.1998) (inexperience per se not sufficient to establish ineffective assistance of counsel).

{¶ 216} The record shows that defense counsel employed a clinical psychologist, Dr. Fabian, who was a mitigation expert, an investigator secured through the public defender's office, and a social worker who was affiliated with the public defender's office. Dr. Fabian interviewed Jackson on numerous occasions and conducted extensive testing in evaluating him. He reviewed Jackson's school records, prison records, employment history, medical records, and the forensic psychological reports completed by the Court Psychiatric Clinic. Dr. Fabian also interviewed Jackson's parents and other family members. Thus, the record shows that the defense had thoroughly prepared for the penalty phase.

{¶ 217} Defense counsel's comment that they were "overwhelmed with discovery" was made in the context of a defense-requested continuance. This comment was made approximately two months before trial, and nothing shows that counsel were unable to review discovery before trial began. Similarly, assistant defense counsel's comment about the "embryonic stages" of the investigation, and his comment that the public defender's office had started to work on the case only in September 2009 does not show that counsel were unprepared when trial started. This court "cannot infer a defense failure to investigate from a silent record." *State v. Were*, 118 Ohio St.3d 448, 2008-Ohio-2762, 890 N.E.2d 263, ¶ 244.

{¶ 218} Second, Jackson argues that the panel's sentencing opinion shows that defense counsel were unprepared.

{¶ 219} Jackson asserts that the sentencing opinion indicates that defense counsel should have cast his criminal record in a more favorable light for mitigation purposes. Jackson mentions the panel's comment, "There was no evidence that Defendant's prior involvement in the criminal justice system prevented him from rejoining or otherwise adjusting to family or community life."

{¶ 220} Defense counsel were fully aware of Jackson's criminal history. Defense counsel informed the court that they had reviewed the files from Jackson's prior criminal cases. Moreover, Dr. Fabian's report summarized Jackson's criminal record and mentioned that he had committed numerous disciplinary infractions while in prison. Because it is speculative whether counsel could have presented Jackson's criminal history in the manner that Jackson suggests, defense counsel were not ineffective by failing to do so. *See State v. Foust*, 105 Ohio St.3d 137, 2004-Ohio-7006, 823 N.E.2d 836, ¶ 155.

{¶ 221} Jackson mentions the following statement from the sentencing opinion: "Dr. Fabian mentioned as a possibility—but could not conclude as a probability—that Defendant suffered from [a] substance abuse-induced psychosis that would explain or mitigate his conduct that date." Jackson appears to be arguing that counsel were ineffective by failing to prepare Dr. Fabian as a witness and eliciting testimony from him that there was a probability, rather than a possibility, that he suffered from a substance-abuse psychosis at the time of the offenses.

{¶ 222} During mitigation, Dr. Fabian testified that Jackson "admitted to using quite a bit of PCP prior to the offense or the date of in addition to alcohol and cocaine or at least marijuana." Dr. Fabian added, "[T]here is a *possibility* that there was some evidence of intoxication and a substance-induced psychosis due to the PCP that he had used." (Emphasis added.) It is speculative whether Dr. Fabian would have testified differently had he been prepared or questioned differently. *See State v. Braden*, 98 Ohio St.3d 354, 2003-Ohio-1325, 785 N.E.2d

439, ¶ 121 (counsel not ineffective for failing to show that the defendant's paranoid schizophrenia qualified as an R.C. 2929.04(B)(3) mitigating factor). Thus, this ineffectiveness claim is also rejected.

{¶ 223} Third, Jackson argues that defense counsel failed to adequately prepare Dr. Fabian so he would address in his testimony how Jackson's substance abuse, low intelligence, and child abuse affected his actions on the date of the murder. Jackson asserts that defense counsel's failure to establish a nexus between these factors and the offenses allowed the three-judge panel to assign less mitigating weight to them.

{¶ 224} Dr. Fabian's testimony and written report refute this claim. Dr. Fabian stated that Jackson had a significant history of alcohol and drug use leading to substance dependence. Dr. Fabian outlined Jackson's reported substance abuse:

> [He was] using an ounce of PCP per day, a quarter-ounce to a half-ounce of marijuana per day. That's a lot of marijuana, a lot of PCP.
>
> He reported using cocaine every day during the last few years. He also reported drinking alcohol quite significantly, fifths of alcohol or 12 packs, drinking to get intoxicated, and usually to get high [on] the substances that he was using.

Dr. Fabian also mentioned that Jackson reported "smoking marijuana and PCP the day of the instant offense" and that Jackson reported using alcohol and cocaine prior to the offense.

{¶ 225} Dr. Fabian testified about the link between substance abuse and murder, stating, "there's been some research discussing * * * the likelihood of there being alcohol or drugs involved in homicide cases and the numbers are quite

high. Perhaps even up to a third or 50 percent of homicide cases there is some type of substance abuse involved by the perpetrator." In addition, Dr. Fabian testified, "Individuals that are under the intoxication of PCP—well, Jeremiah called himself or referred to himself as a werewolf. So they can hallucinate, they can have faulty paranoid thinking to the threshold of a delusion, a fixed false bizarre/nonbizarre belief." As previously discussed, Dr. Fabian also testified that "there is a possibility that there was some evidence of intoxication and a substance-induced psychosis due to the PCP that he had used."

{¶ 226} Jackson fails to explain what other testimony Dr. Fabian should have presented. Dr. Fabian presented information about Jackson's reported substance abuse on the date of the offense and discussed the possible link between that use and the offenses. It is speculative whether Dr. Fabian could have presented additional evidence establishing a nexus between Jackson's substance abuse and the offenses. Thus, Jackson has failed to establish that counsel were deficient by failing to elicit more testimony. *See Foust*, 105 Ohio St.3d 137, 2004-Ohio-7006, 823 N.E.2d 836, at ¶ 155.

{¶ 227} As to low intelligence, Dr. Fabian reported that Jackson suffers from a cognitive disorder and functions in the borderline range of intelligence. Dr. Fabian supported that conclusion with evidence of Jackson's poor grades in school and intelligence-test results showing that he had a 75 IQ.

{¶ 228} During his testimony, Dr. Fabian discussed the possible link between Jackson's low intelligence and his drug use: "Individuals with cognitive impairment especially residing in areas such as Jeremiah's, low socioeconomic areas with histories of drug trafficking and drug use are more prone to be using substances such as that." Dr. Fabian also testified that Jackson's low intellectual functioning is one of several factors that "would be related empirically to some degree in this case to violence." He stated that such factors are cumulative and additive in nature:

> So the fact that this individual has low intellectual functioning, poor verbal skills, substance abuse and dependence, was potentially intoxicated at the time of the offense, unemployed experienced relationship problems, and had access to weapons and substances * * * I think those would act cumulatively rather than just in isolation.

{¶ 229} Jackson fails to explain what other testimony Dr. Fabian should have provided linking his low intelligence with the offenses. Dr. Fabian explained how Jackson's low intelligence may have contributed to his offenses. Because it is speculative whether Dr. Fabian could have provided further mitigating testimony about Jackson's low intelligence, we reject this ineffectiveness claim.

{¶ 230} As to child abuse, Dr. Fabian stated that Jackson reported that he had been sexually abused when he was a child by two different women who attended his father's church.

{¶ 231} Trial counsel asked Dr. Fabian about the link between "problem behavior or drug or alcohol aggression" and a history of sexual abuse. Dr. Fabian responded, "There's two caveats to this, whether it did in fact occur and some of the research is mixed on this issue, but I would say that assuming the abuse occurred he would be at a higher risk to have problematic behaviors."

{¶ 232} Dr. Fabian was unable to verify Jackson's claim of child abuse. However, Dr. Fabian explained that assuming Jackson was abused, he was at a "higher risk" for "problematic behaviors." Once again, Jackson fails to specify additional testimony that Dr. Fabian should have presented on this matter. Thus, this ineffectiveness claim lacks merit.

{¶ 233} Fourth, Jackson argues that defense counsel were ineffective by failing to obtain a substance-abuse expert to establish the nexus between Jackson's substance abuse and the offenses.

{¶ 234} Dr. Fabian reported on Jackson's long history of drug and alcohol abuse. Dr. Fabian testified that Jackson reported using PCP, marijuana, and cocaine and consuming alcohol before the offenses. He then discussed the possible link between Jackson's substance abuse and the offenses. Based on the evidence presented, Jackson fails to establish that his counsel were deficient by failing to hire a substance-abuse expert to provide additional testimony. *See State v. Powell*, 132 Ohio St.3d 233, 2012-Ohio-2577, 971 N.E.2d 865, ¶ 210-211 (substance-abuse expert not required, because a clinical and forensic psychologist provided testimony about defendant's alcohol and drug abuse).

{¶ 235} Finally, Jackson argues that his counsel were ineffective by failing to object to the prosecutor's improper penalty-phase closing argument. Even if we assume that counsel were deficient, none of the prosecutor's closing argument prejudiced him, because we presume that the three-judge panel considered only relevant, material, and competent evidence in arriving at its judgment absent a showing to the contrary. *Post*, 32 Ohio St.3d at 384, 513 N.E.2d 754. Thus, this claim also lacks merit.

{¶ 236} Based on the foregoing, we reject proposition of law No. VIII.

### 3. Failure to consider mercy (proposition of law No. IX)

{¶ 237} Jackson argues that the three-judge panel abused its discretion by failing to consider mercy in determining the appropriateness of the death sentence.

{¶ 238} Defense counsel argued for mercy during the penalty-phase closing arguments. The three-judge panel stated in the sentencing opinion, "The defense urged the Court to show mercy in arriving at its decision. While Defendant is entitled to argue mercy, it is not a mitigating factor under Ohio law."

**{¶ 239}** Mercy is not a mitigating factor under Ohio law. *State v. O'Neal*, 87 Ohio St.3d 402, 416, 721 N.E.2d 73 (2000); *State v. Lorraine*, 66 Ohio St.3d 414, 418, 613 N.E.2d 212 (1993) ("Mercy, like bias, prejudice, and sympathy, is irrelevant to the duty of the jurors").

**{¶ 240}** Jackson cites *Kansas v. Marsh*, 548 U.S. 163, 176, 126 S.Ct. 2516, 165 L.Ed.2d 429 (2006), and *Penry v. Lynaugh*, 492 U.S. 302, 326, 109 S.Ct. 2934, 106 L.Ed.2d 256 (1989), in arguing that the three-judge panel should have considered mercy. But neither case holds that a trial court must consider mercy as a mitigating factor in capital proceedings. Proposition of law No. IX is overruled.

### 4. Failure to consider mitigating evidence
### (proposition of law No. X)

**{¶ 241}** Jackson argues that the three-judge panel violated his constitutional rights by refusing to consider mitigating evidence that the defense had presented.

**{¶ 242}** In *Eddings v. Oklahoma*, 455 U.S. 104, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982), the Supreme Court of the United States held, "Just as the State may not by statute preclude the sentencer from considering any mitigating factor, neither may the sentencer refuse to consider, *as a matter of law*, any relevant mitigating evidence." (Emphasis sic.) *Id*. at 113-114. The sentencer in a capital case "may determine the weight to be given relevant mitigating evidence," but "may not give it no weight by excluding such evidence from [its] consideration." *Id*. at 114-115.

**{¶ 243}** First, Jackson argues that the panel refused to consider evidence that he had endured physical and sexual abuse in his youth. Dr. Fabian reported that Jackson's parents "admitted to beating and whipping Jeremiah especially when Jeremiah made them mad." Jackson's mother also related, "I told the teacher to beat him and put the fear into him but I never saw marks or bruises on him." Dr. Fabian also testified:

The parents had indicated that they tried to discipline through the church and they endorsed physical disciplinary practices that were stern and consistent. Whether that is abuse of—one could consider some of those statements as being excessive or abusive, but Jeremiah claims that they were not abusive.

In evaluating the evidence of physical abuse for mitigating value, Dr. Fabian stated, "There was questionable—you know, there was corporal punishment in the family. I cannot say at this time whether it's abuse because there [were] no investigations although some of the quotes by the mother about some of the physical punishment may have been excessive."

{¶ 244} As to sexual abuse, Dr. Fabian reported that Jackson said he had been sexually abused when he was a child by two different women who attended his father's church. Dr. Fabian stated that Jackson's parents denied any knowledge of sexual abuse at church and were surprised when they heard this information. During his testimony, Dr. Fabian questioned whether the sexual abuse was true. In evaluating the evidence of sexual abuse for mitigating value, Dr. Fabian stated, "*Questionable* self-reported sexual abuse between the ages of 6 and 10 by two separate perpetrators at the church." (Emphasis added.)

{¶ 245} In the sentencing opinion, the panel discussed the mitigating weight given to the evidence of physical and sexual abuse:

The Defense argued as mitigatory the physical abuse imposed as discipline on Defendant while at home with his parents and at his mother's daycare and suggested possible sexual abuse while a child by two adult female perpetrators who had access to

him at church. The Court finds these matters are entitled to no weight. The *only evidence* provided is the Defendant's own description of the physical abuse and sexual abuse and no credible evidence corroborates the evidence presented. No evidence suggested it was traumatizing to Defendant. No evidence demonstrated an adverse impact on Defendant or a connection between the abuse and Defendant's conduct leading up to June 18, 2009.

(Emphasis added.)

{¶ 246} The sentencing opinion shows that the panel considered the evidence of physical and sexual abuse as mitigating evidence but chose to give it no weight. *See Foust*, 105 Ohio St.3d 137, 2004-Ohio-7006, 823 N.E.2d 836, at ¶ 171. Jackson contends that the panel's failure to afford that abuse any weight ignored the reality that in child-abuse cases there is rarely corroborative evidence. But "a trial court need not accept mitigating factors at the defendant's proposed valuation; their weight is for the trial court to determine." *State v. Hale*, 119 Ohio St.3d 118, 2008-Ohio-3426, 892 N.E.2d 864, ¶ 153.

{¶ 247} Nevertheless, the panel misstated the evidence in concluding that Jackson's claims were the "only evidence" of physical abuse. Jackson's parents admitted "beating and whipping" him as a child. However, our independent review of the sentence will cure this error in the sentencing opinion. *See State v. Ahmed*, 103 Ohio St.3d 27, 2004-Ohio-4190, 813 N.E.2d 637, ¶ 113; *State v. Fox*, 69 Ohio St.3d 183, 191, 631 N.E.2d 124 (1994).

{¶ 248} Second, Jackson argues that the panel erred by giving only limited weight to mitigating evidence of his low intelligence. Dr. Fabian testified that Jackson suffered from a cognitive disorder and functions in the borderline range

of intelligence. Dr. Fabian testified that Jackson had poor grades in school and had a 75 IQ.

{¶ 249} In the sentencing opinion, the panel stated:

> The Defendant has a lower than average intelligence. His intelligence test results over the years were presented and the subject of argument. That evidence is entitled to limited weight in mitigation. Defendant's school records and evidence of the Defendant's comprehension and cognitive impairments was entitled to consideration in mitigation. As with evaluation of his intelligence, this evidence was of limited weight because despite such impairment, Defendant's conduct showed foresight, planning, cunning and studied preparation in many respects.

{¶ 250} It is clear that the panel considered Jackson's low intelligence and cognitive impairment as a mitigating factor but chose to give it limited weight. As stated previously, " '[t]he weight, if any, given to a mitigating factor is a matter for the discretion of the individual decisionmaker.' " *State v. Thomas*, 97 Ohio St.3d 309, 2002-Ohio-6624, 779 N.E.2d 1017, ¶ 81, quoting *State v. Filiaggi*, 86 Ohio St.3d 230, 245, 714 N.E.2d 867 (1999). Thus, the panel could reasonably assign whatever weight, if any, it deemed appropriate to that mitigating evidence.

{¶ 251} Jackson quotes *Atkins*, 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335, which held that mentally retarded defendants cannot be executed, in arguing that his low intelligence was entitled to more weight in mitigation. But Jackson was not found to be mentally retarded. Thus, we reject this argument.

{¶ 252} Jackson also argues that the panel's opinion shows that it confused his intelligence with a mental defect pursuant to R.C. 2929.04(B)(3).[3] Here, Jackson points to the panel's statement that "[d]espite that lower than average intelligence, he clearly knew right from wrong and fully appreciated the criminality of his conduct in committing the Aggravated Robbery and Aggravated Murder under the factual circumstances present here." Nothing shows that the panel was confused. The panel was not applying R.C. 2929.04(B)(3). Rather, the panel was explaining its rationale for discounting Jackson's low intelligence as a mitigating factor.

{¶ 253} Third, Jackson argues that the panel erred by failing to mention whether any weight was given to his poor socioeconomic environment. Dr. Fabian discussed Jackson's socioeconomic environment as a mitigating factor: "The socioeconomic environment that the defendant had resided in developmentally was a poor one at that with exposure to—access and exposure or witnessing substance abuse or trafficking, weapons and violence."

{¶ 254} In the sentencing opinion, the panel addressed this evidence:

> Defense argues Defendant's poor socio-economic environment while growing up is mitigatory. The evidence was scant that Defendant was raised in a poor socio-economic setting. To the contrary, Defendant described himself as having a family that never wanted for any of the basic needs of life. The evidence established that Defendant was raised in a rather large extended family and was the youngest sibling of the family. * * * The

---

[3] The R.C. 2929.04(B)(3) mitigating factor states: "Whether, at the time of committing the offense, the offender, because of a mental disease or defect, lacked substantial capacity to appreciate the criminality of the offender's conduct or to conform the offender's conduct to the requirements of the law."

family was never on public assistance and both parents worked at gainful employment outside of the home. * * * Additionally, the Court considered that the Defendant had family members that still loved him, faithfully attended trial and had concern for him. There was some evidence Defendant witnessed shootings, use of weapons and drug use as a child but no evidence established this was a pervasive factor in his youth or had influenced his attitude or outlook significantly when he became an adult. *This evidence taken as a whole* was not entitled to significant weight in mitigation in the Court's view.

(Emphasis added.) Thus, the sentencing opinion shows that the panel considered Jackson's poor socioeconomic environment as a mitigating factor but chose not to give it significant weight in mitigation.

{¶ 255} As a final matter, Jackson states that the panel mentioned that Jackson had the love and support of his family, but failed to assign any mitigating weight to this evidence. However, the sentencing opinion shows that the panel considered evidence that Jackson had the love and support of his family but chose not to give it significant weight. " 'The fact that an item of evidence is admissible under R.C. 2929.04(B)(7) does not automatically mean that it must be given any weight.' " *Fox*, 69 Ohio St.3d at 191, 631 N.E.2d 124, quoting *State v. Steffen*, 31 Ohio St.3d 111, 509 N.E.2d 383 (1987), paragraph two of the syllabus. Thus, no error was committed.

{¶ 256} Based on the foregoing, we overrule proposition of law No. X.

### C. Remaining issues

#### 1. Cumulative error (proposition of law No. XIII)

{¶ 257} Jackson argues that cumulative errors committed during the trial deprived him of a fair trial and require a reversal of his convictions and death sentence.

{¶ 258} *State v. DeMarco*, 31 Ohio St.3d 191, 509 N.E.2d 1256 (1987), paragraph two of the syllabus, recognized the doctrine of cumulative error. Under this doctrine, a conviction will be reversed when the cumulative effect of errors in a trial deprives a defendant of a fair trial even though each of the numerous instances of trial court error does not individually constitute cause for reversal. *Id.* at 196-197. *See also Powell*, 132 Ohio St.3d 233, 2012-Ohio-2577, 971 N.E.2d 865, at ¶ 222-224; *State v. Garner*, 74 Ohio St.3d 49, 64, 656 N.E.2d 623 (1995).

{¶ 259} The doctrine of cumulative error is not applicable in the present case. Jackson received a fair trial. Moreover, none of the errors committed in this case, when considered either individually or cumulatively, resulted in prejudicial error. As previously discussed in other propositions of law, overwhelming evidence was introduced that established Jackson's guilt. Proposition of law No. XIII is overruled.

#### 2. Proportionality (proposition of law No. XII)

{¶ 260} Jackson argues that Ohio's proportionality review is unconstitutional. He contends that a meaningful proportionality review must include cases resulting in life imprisonment after a capital-sentencing hearing as well as those resulting in the imposition of the death penalty. However, we have consistently held that the proportionality review required by R.C. 2929.05(A) is satisfied by a review of cases in which the death penalty has been imposed. *See State v. Scott*, 101 Ohio St.3d 31, 2004-Ohio-10, 800 N.E.2d 1133, ¶ 51; *LaMar*, 95 Ohio St.3d 181, 2002-Ohio-2128, 767 N.E.2d 166, at ¶ 23; *Steffen*, 31 Ohio

St.3d 111, 509 N.E.2d 383, at paragraph one of the syllabus. Proposition of law No. XII is rejected.

### 3. Constitutionality (propositions of law Nos. XI and XIV)

{¶ 261} In proposition of law No. XI, Jackson argues that Ohio's death-penalty statutory scheme is unconstitutional because it has failed to narrow the class of offenders eligible for the death penalty. But we have repeatedly rejected such arguments. *See, e.g., State v. Henderson*, 39 Ohio St.3d 24, 28-29, 528 N.E.2d 1237 (1988); *State v. Moore*, 81 Ohio St.3d 22, 39, 689 N.E.2d 1 (1998); *Fitzpatrick,* 102 Ohio St.3d 321, 2004-Ohio-3167, 810 N.E.2d 927, at ¶ 73-76.

{¶ 262} Jackson also claims that the "obliteration of the line" between prior calculation and design to establish  aggravated murder under R.C. 2903.01(A) and murder under R.C. 2903.02(A) has created an unconstitutional "vagueness problem."  In making this argument, Jackson asserts that an instantaneous homicide can be classified as committed with prior calculation and design.

{¶ 263} In *Tuilaepa v. California*, 512 U.S. 967, 972, 114 S.Ct. 2630, 129 L.Ed.2d 750 (1994), the Supreme Court stated:

> As we have explained, the aggravating circumstance must meet two requirements. First, the circumstance may not apply to every defendant convicted of a murder; it must apply only to a subclass of defendants convicted of murder. See *Arave v. Creech*, 507 U.S. 463, 474, 113 S.Ct. 1534, 1542, 123 L.Ed.2d 188 (1993) ("If the sentencer fairly could conclude that an aggravating circumstance applies to *every* defendant eligible for the death penalty, the circumstance is constitutionally infirm"). Second, the aggravating circumstance may not be unconstitutionally vague.

(Emphasis sic.)

{¶ 264} As to vagueness, in *Maynard v. Cartwright*, 486 U.S. 356, 361-362, 108 S.Ct. 1853, 100 L.Ed.2d 372 (1988), the Supreme Court stated:

> Claims of vagueness directed at aggravating circumstances defined in capital punishment statutes are analyzed under the Eighth Amendment and characteristically assert that the challenged provision fails adequately to inform juries what they must find to impose the death penalty and as a result leaves them and appellate courts with the kind of open-ended discretion which was held invalid in *Furman v. Georgia*, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972).

*Tuilaepa* added, "Because 'the proper degree of definition' of eligibility and selection factors often 'is not susceptible of mathematical precision,' our vagueness review is quite deferential." *Tuilaepa* at 973, quoting *Walton v. Arizona*, 497 U.S. 639, 655, 110 S.Ct. 3047, 111 L.Ed.2d 511 (1990). "Relying on the basic principle that a factor is not unconstitutional if it has some 'common-sense core of meaning * * * that criminal juries should be capable of understanding,' *Jurek v. Texas*, 428 U.S. 262, 279, 96 S.Ct. 2950, 2959, 49 L.Ed.2d 929 (1976) (White, J., concurring in judgment), we have found only a few factors vague * * *." *Id.* at 973-974.

{¶ 265} Jackson is incorrect in asserting that a conviction for aggravated murder based on prior calculation and design can be upheld on the basis of an instantaneous eruption of events. *See State v. Goodwin*, 84 Ohio St.3d 331, 344, 703 N.E.2d 1251 (1999). In *State v. Campbell*, 90 Ohio St.3d 320, 341, 738 N.E.2d 1178 (2000), this court emphasized that "purpose to kill is not the same thing as prior calculation and design and does not by itself satisfy the *mens rea*

element of R.C. 2903.01(A)." The court quoted the jury instructions for prior calculation and design:

> "A person acts with prior calculation and design when by engaging in a *definite process of reasoning* he forms a purpose to kill *and plans the method he intends to use to cause death*. "The circumstances surrounding the homicide must show *a scheme designed* to carry out the *calculated decision* to cause the death. No definite period of time must elapse and no particular amount of consideration need be given, but *acting on the spur of the moment* or after *momentary consideration* of the purpose to cause death *is not sufficient*." (Emphasis added.)

*Id.* Thus, the element of prior calculation and design does not apply to every intentional murder.

{¶ 266} As to Jackson's constitutional claims, the difference between prior calculation and design and purpose has a "common sense core of meaning" that adequately informs the sentencer what it must find to impose the death penalty, thereby alleviating any vagueness concerns. Thus, this argument lacks merit.

{¶ 267} Next, Jackson appears to claim that Ohio's statutory scheme is unconstitutional because it impermissibly prevents the sentencer from considering mercy as a mitigating factor. But we have previously rejected such claims. *See Steffen*, 31 Ohio St.3d at 125, 509 N.E.2d 383.

{¶ 268} Finally, Jackson argues that Ohio's death-penalty statutory scheme violates the constitutional prohibitions against arbitrary and unequal punishment. These claims also lack merit. *See, e.g., State v. Ferguson*, 108 Ohio St.3d 451, 2006-Ohio-1502, 844 N.E.2d 806, ¶ 86; *State v. Jenkins*, 15 Ohio St.3d 164, 169-170, 473 N.E.2d 264 (1984).

{¶ 269} In proposition of law No. XIV, Jackson asserts additional constitutional challenges against Ohio's capital-punishment scheme. We also reject these claims. *See, e.g., State v. Fry*, 125 Ohio St.3d 163, 2010-Ohio-1017, 926 N.E.2d 1239, ¶ 215-216; *State v. Carter*, 89 Ohio St.3d 593, 607-608, 734 N.E.2d 345 (2000); *Jenkins* at paragraph one of the syllabus.

{¶ 270} Jackson also challenges the constitutionality of Ohio's reasonable doubt standard. However, we have affirmed the constitutionality of R.C. 2901.05(D). *See State v. Jones*, 91 Ohio St.3d 335, 347, 744 N.E.2d 1163 (2001).

{¶ 271} Finally, Jackson claims that Ohio's death-penalty statutes violate international law and treaties to which the United States is a party. This argument also lacks merit. *See State v. Issa*, 93 Ohio St.3d 49, 69, 752 N.E.2d 904 (2001); *State v. Phillips*, 74 Ohio St.3d 72, 103-104, 656 N.E.2d 643 (1995).

{¶ 272} Propositions of law Nos. XI and XIV are rejected.

## IV. Independent Sentence Evaluation

{¶ 273} Having considered Jackson's propositions of law, we now independently review Jackson's death sentence for appropriateness and proportionality as R.C. 2929.05(A) requires.

### A. Aggravating circumstances

{¶ 274} Jackson was convicted of murdering Tracy Pickryl as part of a course of conduct involving the purposeful killing or attempt to kill two or more persons (Pickryl and Christy Diaz) in violation of R.C. 2929.04(A)(5). He was also convicted of committing murder while committing or attempting to commit aggravated robbery, R.C. 2929.04(A)(7), and committing murder while committing or attempting to commit kidnapping, R.C. 2929.04(A)(7). The panel merged the two felony-murder specifications into a single aggravated-robbery specification before sentencing.

{¶ 275} The evidence at trial supports the panel's findings of guilt as to all the aggravating circumstances. As to the felony murder, the evidence established

that Jackson entered the Soap Opera Laundry early on the morning of June 18, 2009.  Jackson pulled a gun and ordered Pickryl to give him the money.  Pickryl told him that there was not any money to give.  Jackson grabbed a necklace from Pickryl's neck and then shot and killed her.  Jackson was later arrested.  A gun found in the house where he was hiding was identified as the murder weapon.

**{¶ 276}** As to the course-of-conduct specification, Jackson killed Pickryl and then turned his gun on Diaz and demanded money.  Diaz handed Jackson a pouch containing money.  Jackson then shot at Diaz and barely missed hitting her in the head.  Jackson later admitted to police that he shot and killed Pickryl and fired at Diaz.  Thus, the facts establish that the murder of Pickryl and the attempted murder of Diaz were directly linked by time and location.  *See State v. Sapp*, 105 Ohio St.3d 104, 2004-Ohio-7008, 822 N.E.2d 1239, ¶ 52 (time, location, murder weapon, and motive can establish the factual link necessary to prove a course of conduct).

### B. Mitigating evidence presented

**{¶ 277}** Against these aggravating circumstances, we weigh the mitigating factors contained in R.C. 2929.04(B).  Jackson called Dr. Fabian and introduced Dr. Fabian's written report, Jackson's school records, his medical records, and his employment records.  Jackson also made an unsworn statement and a statement in allocution.

### 1. Dr. Fabian's testimony

**{¶ 278}** Jackson was raised on Cleveland's east side.  Jackson's father was the pastor of a Cleveland church, and his mother ran a daycare program at that church.  Jackson came from a large family and has nine brothers and sisters.  The children were from his father's two different relationships.  Jackson and one other sibling were the children from his father's relationship with his mother.  Jackson stated that the family was "well provided for" and never wanted for anything.

{¶ 279} Jackson's parents reported that they endorsed physical disciplinary practices that were firm and consistent. Jackson's parents admitted to beating and whipping Jackson, particularly when he made them mad. Jackson also stated that he had been beaten at his mother's daycare.

{¶ 280} Dr. Fabian testified that Jackson had told him that he had been sexually abused by two different women at his father's church. Jackson's parents denied any knowledge of sexual abuse. But Joseph Jackson, the defendant's brother, suspected that an adult female had sexually abused Jackson as a child. Joseph told Dr. Fabian that Jackson would not lie about sexual abuse.

{¶ 281} Jackson's parents reported that Jackson had exhibited some behavioral problems as a child. Joseph reported that Jackson was "slow with everything." He stated that Jackson tended to associate "with others who were getting into trouble, because they were not outperforming him and were not smarter than him. * * * These people reinforced him to do the wrong things and be involved with criminal activity."

{¶ 282} Joseph stated that he and Jackson grew up in Cleveland's Kinsman area and that it was not a bad area when they were young, but later, the neighborhood deteriorated. Joseph witnessed men shooting guns in the street, and "one time someone was shot by a cop in the church and [Jackson] and I had to clean the blood up." Jackson also reported, "I've seen people get shot and killed about three times, the first time was as a kid."

{¶ 283} Jackson attended Cleveland public schools and quit school in the 12th grade while attending Max Hayes High School. His school records show that he was a poor student and missed a lot of school. Dr. Fabian testified that Jackson's vocabulary comprehension was particularly lacking.

{¶ 284} Dr. Fabian reported that Jackson has worked at a variety of jobs. These include working as a kitchen worker and chef, an assembly-line worker, a machine operator, a security guard, a house painter, and a dishwasher. Jackson

told Dr. Fabian that he was homeless and unemployed at the time of the offenses. Jackson's family reported that Jackson is married but that the marriage is extremely dysfunctional.

{¶ 285} Dr. Fabian testified that Jackson "does not suffer from any significant mental illness such as psychosis or mood disorder." However, Dr. Fabian stated that testing indicated that Jackson has "cognitive impairments in various areas including low intelligence, deficient academic achievement abilities and some cognitive neuropsychological deficits. I believe * * * that they are connected and correlated with one another."

{¶ 286} Jackson was administered the WAIS-IV to assess his current intellectual functioning. Jackson's overall IQ score of 75 placed him in the fifth percentile and the borderline range of intellectual functioning. Jackson's scores on the WAIS-IV subtests showed impairments in all areas. Dr. Fabian also testified that Jackson had taken the GAMA, which is a brief IQ test, and his IQ was determined to be 87 in 2003 and 93 in 2007. In addition, Jackson took the WASI in September 2009, and his IQ was determined to be 87.

{¶ 287} Jackson was administered the Woodcock-Johnson, Third Edition, to assess his academic achievement. He was tested in 11 academic areas. Dr. Fabian reported, "When considering the following grade and age equivalencies, his results from these eleven areas were approximately in the 6.9 grade equivalent and 11 years, 8 months age equivalent."

{¶ 288} Jackson also took the Neuropsychological Assessment Battery ("NAB") to assess his attention, memory, visual-spatial construction, language, and executive functioning. The results were in the below-average range and placed him in the 16th percentile. Dr. Fabian reported that "[o]verall the consistencies between the WAIS-IV, the NAB, and the Woodcock-Johnson III include problems and impairments in language skills, memory abilities and attention."

{¶ 289} Dr. Fabian stated that Jackson has a significant history of substance abuse and dependence. Jackson reported that he began using alcohol and marijuana at the age of 14. Dr. Fabian testified that Jackson's "drugs of choice were alcohol, phencyclidine or what we call PCP or angel dust, cannabis, marijuana, and then he's taken opiate-type pills such as Oxycontin, used and abused cocaine and LSD." Jackson reported that he was using an ounce of PCP and a quarter-ounce to a half-ounce of marijuana every day. Jackson also reported using cocaine on a daily basis during the last few years and drinking significant amounts of alcohol.

{¶ 290} Dr. Fabian also testified that Jackson was administered the substance-abuse screening inventory ("SASSI-3") and "he clearly met [the] criteria for substance dependence, both alcohol and drug dependence." Dr. Fabian testified that Jackson "reported symptoms of dependence, nausea, dizziness, hallucinations, flashbacks, [and] drinking more than intended, [and] his substances have interfered with relationships, so it's affected work and school."

{¶ 291} In closing his report, Dr. Fabian summarized the mitigating factors that could be considered: (1) cognitive impairments, probable cognitive disorder and functioning in the borderline range of intellectual functioning, (2) history of polysubstance dependence and likely intoxicated state at the time of the offenses with substance dependency of phencyclidine, cannabis, alcohol, cocaine, and opioids, (3) abuse at home, including, at a minimum, harsh corporal physical discipline, (4) questionable self-reported sexual abuse between the ages of six and ten by two separate women at church, (5) witnessing violence in the community, including, according to Jackson, at least three murders, (6) growing up in a low socioeconomic community with exposure to possession of weapons, drug use, drug trafficking, and community violence, and (7) notable psychosocial stressors around the time of the offenses.

2. Jackson's unsworn statement

{¶ 292} Jackson apologized to his family and Tracy Pickryl's family in his unsworn statement:

I know I did wrong * * *. I'm trying to come up here and tell you all straight from the heart that I know I was wrong and I let evil begot evil. And I'll say it again, I'm willing to accept the consequences of my actions.

And I really like to apologize to my family, putting you all through this, and I especially like to apologize to Tracy Pickryl's family, her community, her friends because I know it's hard for you all to sleep at night.

{¶ 293} Jackson continued by examining his actions, expressing his willingness to accept the consequences for what he did, and apologizing to Christy Diaz:

Every time I think about it, I mean when I seen the pictures I think like that could have been my sister, that could have been my aunt, that could have been somebody of mine that's up there and I know it was stupid * * * and I have to come up here and say it's drugs and all of that but it was just—I let evil get ahold of me, * * * and I know there's a lot of other people out there and they doing the same thing and because they got the demon inside of them and it's not them, it's that demon inside of them. And I thank God that through the prayers and through my family that I believe that that demon been set aside and we killed that demon, * * * that I feel like I'm ready to do the right things now, * * * but like I

said, I'm willing to accept my consequences for my actions * * *
and especially Christy Diaz, I want to apologize to you.

### 3. Allocution

{¶ 294} Before final sentencing, Jackson apologized for his actions but said it was a "cold blooded accident." Jackson said, "I shouldn't have went in there in the first place. This is where I was wrong." Jackson then dramatically changed the tone of his remarks:

> I want God to bless all of you. I hope all you have is a sweet memory and you forget about this, forget about this evilness that occurred, you know.
>
> God damn America, like Jeremiah Wright said. God damn America.
>
> THE COURT: Little louder, please.
>
> THE DEFENDANT: God damn America.
>
> The simple fact is * * * being in Ohio and the way Ohio treat defendants and do people that come through this Court, you all make people come out here and do the evil things that they do, you know.

{¶ 295} Jackson then complained about how he had been wrongfully treated by the court system by being improperly labeled as a sex offender for six years. Jackson also complained about his treatment after he had violated probation for drug use. Jackson concluded his unsworn statement by referring to his experience with the court system and his defense counsel following an apparent abduction charge:

I was in the Church and the—you have the abduction on paper. I wanted to take her home to her place where her family was, and I tried to do that, but they don't talk about the part where the lady even admitted how she was on X pills.

She was messed up and somebody raped her before she even got to that church, but I plea bargained because they don't want to talk about how my lawyer was some shit, and he didn't give a fuck.

He was scandalous. He told me just plea bargain and cop out. That is the best thing for you because they don't give a fuck and it's a white lady and you can't win.

But, like I said, God damn America, you know? America ain't shit.

Fuck you all. You can kiss my ass.

*C. Sentence evaluation*

{¶ 296} We find nothing mitigating in the nature and circumstances of the offense. Jackson robbed the Soap Opera Laundry and killed Tracy Pickryl when she told him there was no money. He also shot at Christy Diaz but just missed hitting her. These are horrific crimes with no mitigating features.

{¶ 297} Jackson's history, character, and background do offer some mitigating evidence. Jackson grew up in a large family. His father was a church pastor and his mother ran the church's daycare program. However, his parents admitted beating and whipping him, particularly when he made them mad. Jackson also grew up in a poor socioeconomic area and was exposed to drugs and violence as a young person. In addition, Jackson experienced a tumultuous marriage, and his wife had a serious drug problem, according to Jackson's family

members. Nevertheless, we find that none of these facts are entitled to significant weight in mitigation. *See Fears*, 86 Ohio St.3d at 349, 715 N.E.2d 136.

{¶ 298} The statutory mitigating factors contained in R.C. 2929.04(B) include victim inducement, R.C. 2929.04(B)(1); duress, coercion, or strong provocation, (B)(2); mental disease or defect, (B)(3); youth of the offender, (B)(4); lack of a significant criminal record, (B)(5); accomplice only, (B)(6); and any other relevant factors, (B)(7).

{¶ 299} The first six of these factors do not apply, but several points in mitigation occur under the (B)(7) factor. We give considerable weight to Jackson's cognitive impairments and his borderline range of intellectual functioning (IQ of 75). We also give some weight to Jackson's history of drug and alcohol dependence. *See State v. Craig*, 110 Ohio St.3d 306, 2006-Ohio-4571, 853 N.E.2d 621, ¶ 146.

{¶ 300} In addition, we give some weight to evidence that Jackson was sexually abused by two different women attending his father's church. *See State v. Lynch*, 98 Ohio St.3d 514, 2003-Ohio-2284, 787 N.E.2d 1185, ¶ 195. Dr. Fabian indicated some doubt about the truthfulness of Jackson's self-reported abuse. But Jackson's brother stated that he suspected that Jackson had been sexually abused during childhood by an adult female and stated that Jackson would not lie about sexual abuse.

{¶ 301} We also give weight to Jackson's employment history and the love and support that he has from his family members. *See State v. Trimble*, 122 Ohio St.3d 297, 2009-Ohio-2961, 911 N.E.2d 242, ¶ 327.

{¶ 302} Jackson accepted responsibility for his actions and apologized to Pickryl's family and Christy Diaz in his unsworn statement. But during allocution, Jackson stated that the murder was "a cold blooded accident" and "nothing that I meant to do." Jackson also complained about how he had been wrongfully treated by the court system through the years and blamed the court for

making people "do the evil things that they do." Thus, Jackson fails to take full responsibility for his actions. Jackson's denials negate the mitigating weight that we might otherwise give to his apologies and remorse. *See Hunter*, 131 Ohio St.3d 67, 2011-Ohio-6524, 960 N.E.2d 955, at ¶ 205. The evidence does not suggest any other (B)(7) mitigating factors.

{¶ 303} After independently weighing the facts, we find that the aggravating circumstances outweigh the mitigating factors beyond a reasonable doubt. Jackson's murder of Pickryl during an aggravated robbery and his course of conduct in murdering Pickryl and attempting to murder Diaz are egregious aggravating circumstances. Jackson's mitigating evidence has little significance in comparison.

{¶ 304} As a final matter, we hold that the death penalty is proportionate to death sentences approved in other cases. We have upheld death sentences in other cases combining a course-of-conduct specification with a robbery-murder specification. *See State v. Perez*, 124 Ohio St.3d 122, 2009-Ohio-6179, 920 N.E.2d 104, ¶ 253; *Beuke*, 38 Ohio St.3d at 45, 526 N.E.2d 274.

{¶ 305} Moreover, we have approved death sentences in cases involving only an aggravated-robbery specification. *See, e.g., Hale*, 119 Ohio St.3d 118, 2008-Ohio-3426, 892 N.E.2d 864, at ¶ 278; *State v. Lindsey*, 87 Ohio St.3d 479, 492, 721 N.E.2d 995 (2000). We have also approved death sentences involving a course-of-conduct specification when, as here, the defendant committed one murder and one attempted murder. *Perez* at ¶ 254; *Foust*, 105 Ohio St.3d 137, 2004-Ohio-7006, 823 N.E.2d 836, at ¶ 203; *Filiaggi*, 86 Ohio St.3d at 253-254, 714 N.E.2d 867.

## V. *Hall v. Florida*

{¶ 306} In *Hall v. Florida*, ___ U.S. ___, 134 S.Ct. 1986, ___ L.Ed.2d ___ (2014), the United States Supreme Court applied its prior decision in *Atkins v. Virginia*, 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002), to invalidate a

Florida law that precluded the presentation of additional evidence of intellectual disability (i.e., mental retardation) when the offender scored above 70 on IQ tests. The court held that Florida's definition of mental retardation was unconstitutional, explaining that "when a defendant's IQ test score falls within the test's acknowledged and inherent margin of error, the defendant must be able to present additional evidence of intellectual disability, including testimony regarding adaptive deficits." *Hall* at 2001.

{¶ 307} The court noted in its opinion, "Previous opinions of this Court have employed the term 'mental retardation.' This opinion uses the term 'intellectual disability' to describe the identical phenomenon. See Rosa's Law, [P.L. No. 111-256,] 124 Stat. 2643 (changing entries in the U.S. Code from 'mental retardation' to 'intellectual disability') * * *." *Id.* at 1990. Ohio, however, has not similarly changed entries in its statutes. *See, e.g.*, R.C. 2929.06(A) (establishing procedure for resentencing an offender when his or her death sentence "is set aside, nullified, or vacated because a court has determined that the offender is mentally retarded under standards set forth in decisions of the supreme court of this state or the United States supreme court"); R.C. 5126.01(P) (defining "mental retardation"). And we note that in 2009 Sub.S.B. No. 79, the General Assembly renamed county boards of mental retardation and developmental disabilities by deleting references to mental retardation.

{¶ 308} The holding in *Hall* does not apply to this case. Ohio has no statute similar to Florida's that bars additional evidence of mental retardation when the offender scores above 70 on IQ tests. In *State v. Lott*, 97 Ohio St.3d 303, 2002-Ohio-6625, 779 N.E.2d 1011, ¶ 12, this court held that when an offender's IQ is 70, there is a rebuttable presumption that the offender is not mentally retarded, but the offender is not prohibited from presenting additional evidence of mental retardation, including deficits in adaptive functioning.

{¶ 309} Further, Jackson has not claimed in these proceedings that he is, in fact, mentally retarded. The trial court did not conduct an *Atkins* hearing and never made a ruling that Jackson is not mentally retarded. Rather, it held a hearing so that the record would reflect that trial counsel had considered and diligently investigated the *Atkins* issue and justifiably decided not to pursue a claim that Jackson is mentally retarded. And to the extent that Jackson argues that trial counsel provided ineffective assistance by failing to adequately investigate his adaptive functioning, there is no showing that Jackson actually has deficits in intellectual or adaptive functioning that would prove mental retardation or a developmental disability, and therefore he cannot demonstrate prejudice on this record.

## VI. Conclusion

{¶ 310} We affirm the judgments of conviction and sentence of death.

Judgment affirmed.

O'CONNOR, C.J., and PFEIFER and KENNEDY, JJ., concur.

LANZINGER and FRENCH, JJ., concur in judgment only.

O'NEILL, J., dissents.

————————————

**O'NEILL, J., dissenting**.

{¶ 311} Once again, I am compelled to dissent from this court's affirmance of a death sentence. Here, the court places its imprimatur on the execution of an intellectually disabled man, despite the fact that the only evidence presented strongly tends to establish that the victim's injury and death were unintended.

{¶ 312} I do not expect that the court will adopt my view that the death penalty is cruel and unusual and therefore constitutionally forbidden anytime soon. *See, e.g.*, *State v. Wogenstahl*, 134 Ohio St.3d 1437, 2013-Ohio-164, 981 N.E.2d 900, ¶ 2 (O'Neill, J., dissenting). But I do believe that at some point in

the near future this court will be forced to recognize that Ohio's death penalty reaches too far, to too many crimes and to too many criminals. And it will be forced to recognize that Ohio's death penalty tends to distort the law and this court's decisions, as well as society's conceptions of justice and punishment.

{¶ 313} The distortions worked in this case are manifold and vitiate any claim that Jackson's death sentence was fairly imposed. Most notably, Jackson's counsel determined, after investigation and consultation with the independent expert who had fully examined Jackson, that it was inappropriate to file a motion pursuant to *Atkins v. Virginia*, 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002). A successful *Atkins* motion would have prohibited the imposition of the death penalty based on intellectual disability, but Jackson's counsel determined that such a motion would have been unfounded and unsuccessful, and they may well have believed that even filing the motion would have worked to Jackson's detriment. Given that the independent expert was Jackson's primary witness in mitigation, defense counsel could reasonably have determined that requiring that same witness to testify about Jackson's intellectual abilities in a pretrial *Atkins* hearing that was bound to fail would have the effect of blunting the expert testimony's impact and therefore might well cost Jackson his life.

{¶ 314} Rather than accepting trial counsel's strategic decision, the trial court chose to second-guess it. It sua sponte held a "reverse-*Atkins*" hearing to demonstrate that trial counsel's decision to forgo filing an *Atkins* motion was justified and to "build a record on why it wasn't being done." In short, the trial court chose to sit second chair for the defense. Admittedly, trial courts have great latitude in managing the cases over which they preside. But this hearing had one justification only: to protect a yet-to-be-imposed death sentence from reversal in a subsequent appeal. There is simply no other reason to even contemplate such a hearing, and that should give pause to any reviewing court that is concerned about

88

the potential prejudgment of a case and the sanctity of the attorney-client relationship.

{¶ 315} In fact, a similar issue gave the trial court pause. The state filed a motion to have defense counsel's entire trial file turned over to the court for in camera and appellate review. The trial court observed that the state's "motion gets at the same issue that I was trying to get at with the Atkins thing, you know, build a record that the defendant has considered things, so that down the road there isn't all this speculation whether something was done right." But the trial court expressed far greater hesitancy on this motion and denied it. It seems that the court may have felt—correctly—that by granting such a motion it would be interfering with Jackson's constitutional rights to present his case and be fairly defended by counsel. Why the trial court failed to recognize that the same damage occurred when the trial court adopted the role of inquisitor and caused the creation of a pretrial record on the *Atkins* issue is a true mystery. And while prejudice to Jackson may not be obvious from the record, the trial court's action calls its impartiality into question. It therefore falls directly into the category of those "structural defects in the constitution of the trial mechanism, which defy analysis by 'harmless-error' standards." *Arizona v. Fulminante*, 499 U.S. 279, 309, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991), citing *Tumey v. Ohio*, 273 U.S. 510, 47 S.Ct. 437, 71 L.Ed. 749 (1927) (trial by judge who is not impartial is structural error that violates due process).

{¶ 316} I remain even more troubled by this court's refusal to truly engage in an independent reweighing of death sentences. Jackson's actions, abhorrent as they are, were undoubtedly influenced by his serious alcohol and drug abuse, his low intelligence, and his troubled background. Dr. Fabian, the independent expert retained by the defense, testified that Jackson had a serious substance dependence, including regular use of cocaine, ecstasy, opioids, and an ounce of PCP and a quarter-ounce of marijuana per day. Jackson stated that he took ecstasy and

smoked PCP and marijuana just before robbing the Soap Opera Laudromat and shooting Tracy Pickryl. And he reported paranoid and delusional thoughts as a result of his PCP abuse, including auditory hallucinations and a belief that he was a werewolf. This must be combined with Jackson's poor intelligence-test results and history of cognitive difficulties, which show that he is low functioning and on the borderline of intellectual disability. All these things taken together create a significant mitigation case, one that this court is required to independently weigh.

{¶ 317} The evidence clearly established that Jackson shot and killed Tracy Pickryl in the awful culmination of a spree of armed robberies that began two weeks earlier when he shot his friend Stanley Bentley in the side. Jackson admitted before and at trial that he had shot Pickryl but maintained that he never meant to kill her and that he had fired the gun only to scare her and that Pickryl had fallen into the line of fire and was hit in the face. This is corroborated by his testimony that he thought about killing Pickryl's coworker Diaz because he did not want to leave any witnesses, but could not do it and instead shot over Diaz's head to "shut her up" so he could escape. Jackson also admitted that he shot Bentley, but he claimed that it was because he believed that Bentley was about to shoot him.

{¶ 318} This is a terrible case, but it should not be a death-penalty case. I dissent.

_____

Timothy J. McGinty, Cuyahoga County Prosecuting Attorney, and Saleh S. Awadallah and Mary H. McGrath, Assistant Prosecuting Attorneys, for appellee.

David L. Doughten and John P. Parker, for appellant.

_____